PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WESTMORELAND COAL COMPANY,

*Petitioner,*

v.

LLOYD A. COX; DIRECTOR, OFFICE
OF WORKERS' COMPENSATION
PROGRAMS,

*Respondents.*

No. 09-1240

On Petition for Review of an Order
of the Benefits Review Board.
(08-0313-BLA; 08-0577-BLA)

Argued: January 28, 2010

Decided: April 8, 2010

Before MICHAEL and DUNCAN, Circuit Judges, and
R. Bryan HARWELL, United States District Judge
for the District of South Carolina,
sitting by designation.

---

Affirmed in part, vacated in part, and remanded by published
opinion. Judge Duncan wrote the opinion, in which Judge
Michael and Judge Harwell joined.

---

## COUNSEL

**ARGUED**: Douglas Allan Smoot, JACKSON KELLY,
PLLC, Charleston, West Virginia, for Petitioner. Ryan Chris-

topher Gilligan, WOLFE, WILLIAMS, RUTHERFORD & REYNOLDS, Norton, Virginia, for Respondents. **ON BRIEF:** Kathy L. Snyder, JACKSON KELLY, PLLC, Morgantown, West Virginia, for Petitioner. Joseph E. Wolfe, WOLFE, WILLIAMS, RUTHERFORD & REYNOLDS, Norton, Virginia, for Respondent Lloyd A. Cox.

---

**OPINION**

DUNCAN, Circuit Judge:

This is a petition for review from a decision of the Benefits Review Board (the "BRB") affirming the Administrative Law Judge's (the "ALJ") award of benefits and attorney's fees under the Black Lung Benefits Act (the "Act"), 30 U.S.C. §§ 901 *et seq.* Petitioner Westmoreland Coal Company ("Westmoreland") argues that the ALJ's decision awarding benefits was contrary to law and unsupported by substantial evidence. Westmoreland also argues that the ALJ's award of attorney's fees was improperly calculated. We find the award of benefits legally proper and supported by substantial evidence, and we therefore affirm that award. However, we find that the ALJ erred in granting an award of attorney's fees without first determining a prevailing hourly rate for the attorney's work. That award must therefore be reconsidered in light of this opinion.

I.

Respondent Lloyd A. Cox worked for Westmoreland as a coal miner for approximately thirty years. On April 16, 2002, Cox filed an application for benefits under the Act, which grants benefits to former miners afflicted with pneumoconiosis, also known as black lung disease. *See* 30 U.S.C. § 901(a). His claim was denied on November 10, 2004. Cox brought a second claim on December 19, 2005. The District Director of

the Office of Workers' Compensation Programs issued a Proposed Decision and Order denying benefits on August 11, 2006. Upon Cox's request for a hearing, the case was transferred to the Office of Administrative Law Judges for a formal hearing to determine whether he was eligible for benefits.

In order to prove eligibility under the Act, Cox had to show that he was totally disabled because of pneumoconiosis caused by his coal-mining employment. *See* 30 U.S.C. §§ 901, 921; 20 C.F.R. §§ 718.202-204, 725.202. Because more than one year had passed since the denial of Cox's first claim, he also had to establish that "one of the applicable conditions of entitlement . . . ha[d] changed since the date upon which the order denying the prior claim became final." 20 C.F.R. § 725.309(d).

The Act provides a statutory presumption of total disability resulting from pneumoconiosis where the coal miner suffers from:

> a chronic dust disease of the lung which (A) when diagnosed by chest [x-ray], yields one or more large opacities (greater than one centimeter in diameter) . . . , (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B).

30 U.S.C. § 921(c)(3). The ALJ based her analysis largely on this statutory presumption under § 921(c)(3). We summarize the evidence relevant to Cox's claim below.[1]

---

[1]All of the evidence discussed in this section was newly presented evidence that was not submitted as part of Cox's original 2004 claim.

A.

Cox began seeking medical help for lung problems in 1995. On January 24, 1995, Cox underwent a computerized tomography ("CT") scan of his lungs. Upon reviewing the image, Dr. T.C. Lepsch observed an opacity in the upper part of Cox's right lung and recommended that chest x-rays be performed in the future to determine whether the opacity cleared. On March 17, 1998, Cox had a consultation with Dr. S. S. Tholpady, who concluded that Cox had coal worker's pneumoconiosis. Dr. Larry Forster saw Cox on October 22, 1998, examined Cox's most recent x-rays, and found that there were opacities that were likely caused by coal worker's pneumoconiosis.

In 2002 Cox underwent a number of tests that revealed a pulmonary mass which several doctors interpreted as either pneumoconiosis or cancer. In April and May of 2002 Dr. Michael Baron reviewed Cox's x-rays and performed a bronchoscopy. According to Dr. Baron, both tests indicated signs that could represent pneumoconiosis or cancer. He recommended that Cox undergo additional testing to rule out cancer. On October 1, 2002, Cox had a chest scan, which was interpreted by Dr. G. Thomas Haines. Dr. Haines noted a large mass, measuring 4.2 by 4.7 centimeters, in the upper lobe of Cox's right lung. On October 24, 2002, Cox saw Dr. William Messerschmidt for a consultation on this pulmonary mass. Dr. Messerschmidt determined that the approximately 5-centimeter mass was probably due to coal worker's pneumoconiosis, but could also be due to cancer.[2] Dr. Messerschmidt had Cox tested for cancer through a needle biopsy and bronchoscopy. Both tests were negative for cancer. Following the cancer tests, on December 11, 2002, Dr. John Hutchison conducted another CT scan which confirmed that Cox had a

---

[2]Cox also underwent a lung biopsy on October 31, 2002, which was examined by Dr. D. R. Hudgens. Dr. Hudgens stated that the biopsy showed possible signs of pneumoconiosis.

large mass, measuring approximately 4 by 3.5 centimeters, in the upper lobe of his right lung.

In 2003 Cox again underwent several tests that showed signs of pneumoconiosis. On January 13, 2003, he saw Dr. J. Randolph Forehand, who interpreted Cox's x-rays as showing pneumoconiosis. On August 7, 2003, Cox had an x-ray, which was interpreted by Dr. Donald Rasmussen. Dr. Rasmussen saw large opacities attributable to pneumoconiosis, but noted that cancer was also a possibility.

In 2005 the possibility of cancer was raised once again. On January 6, 2005, Cox saw Dr. Roger McSharry. Dr. McSharry reviewed Cox's most recent CT scan and saw a dominant right lung lesion and multiple left lung lesions. That same day, Dr. McSharry conducted a bronchoscopy. He found that the masses were likely due to pneumoconiosis, but decided to undertake testing to rule out cancer.[3] Dr. Jack Bechtel then conducted an examination of the cells of the tissue of Cox's right upper lung. Dr. Bechtel concluded that the tissue showed no signs of cancer. He also noted that the examination results were consistent with pneumoconiosis.

In 2006 Cox again had several tests showing signs of pneumoconiosis. On January 30, 2006, Cox had a chest x-ray, which Dr. Forehand interpreted as showing pneumoconiosis. On February 23, 2006, Cox underwent a CT scan reviewed by Dr. Jandre Ward, who determined that the scan showed typical signs of pneumoconiosis. On March 16, 2006, Cox had an x-ray which was interpreted by Dr. Ward. Dr. Ward saw a mass in the center of Cox's right lung measuring approximately three centimeters. He found that the mass was compatible with a diagnosis of pneumoconiosis.

---

[3]As the ALJ made clear, none of Westmoreland's experts reviewed the results of this biopsy.

Beginning in May 2006, several doctors retained by West-moreland evaluated Cox and his medical records. On May 2, 2006, Dr. Richard Naeye examined the results of Cox's biopsies performed in 2002. He concluded that there was not enough tissue in the biopsy specimens to make a specific diagnosis of coal worker's pneumoconiosis.

Cox saw Dr. Kirk Hippensteel at the request of Westmoreland on June 1, 2006. Dr. Hippensteel noted an opacity larger than four centimeters. He opined, however, that the opacity was likely not due to pneumoconiosis because it was partly calcified in a manner inconsistent with pneumoconiosis. He also noted that the waxing and waning of the opacity was consistent with granulomatous inflammation. Dr. Hippensteel concluded that the opacity could be due either to histoplasmosis or to granulomatous disease.

On July 6, 2006, Drs. John Scatarige and William Scott reviewed Cox's x-rays at Westmoreland's request and interpreted them as not showing pneumoconiosis. Dr. Scott also interpreted several CT scans from November 1998 and February 2006. He found that the masses shown were likely not due to pneumoconiosis because they did not have a background of small rounded opacities. Dr. Scott opined that they were more likely due to tuberculosis or histoplasmosis.[4]

On July 10, 2006, Cox underwent another CT scan, which was reviewed by his doctor, Dr. Srikumar Gopalan. Dr. Gopalan noted a large density measuring 5.4 by 3.6 centimeters in the right upper lobe. Dr. Kathleen DePonte also reviewed that CT scan and noted an opacity of at least five centimeters in diameter in the right lung and several smaller opacities in the left. She concluded that the test showed classic findings of pneumoconiosis. Dr. Scott reviewed these results and deter-

---

[4]In 1998 Cox had a test performed to determine whether he had ever been exposed to tuberculosis. The test was negative.

mined that the masses were likely caused by tuberculosis or histoplasmosis.

On August 29, 2006, Dr. Jerome Wiot examined Cox's x-rays at the request of Westmoreland and interpreted them as not showing pneumoconiosis. Dr. Wiot opined that the opacities could be due to sarcoidosis.

On February 27, 2007, Dr. David Rosenberg, Westmoreland's expert, issued a report evaluating Cox's medical records. He found that Cox did not exhibit some of the common symptoms of pneumoconiosis and concluded that he did not have pneumoconiosis. Dr. Rosenberg testified via deposition on May 30, 2007, and stated that, of all the conflicting x-ray interpretations, he found Dr. Wiot's to be most reliable because of his vast experience in the area. He also testified that the calcified mass seen in the tests was consistent not with pneumoconiosis but rather with a post-infectious inflammatory reaction. However, Dr. Rosenberg noted that no tests had been done for sarcoidosis, the possible disease identified by Dr. Wiot, or for histoplasmosis, the possible disease identified by Drs. Scott and Hippensteel. He acknowledged that further testing would be necessary to establish those diagnoses.

On July 2, 2007, Westmoreland's expert, Dr. Paul Wheeler, evaluated one of Cox's x-rays from 2006 and found it to be negative for pneumoconiosis.

B.

In Cox's second claim, all of the above-mentioned medical evidence was presented to the ALJ for evaluation. On January 14, 2008, the ALJ issued an order finding in favor of Cox. She concluded that Cox had "established that he is entitled to the presumption of total disability due to complicated pneumoconiosis." J.A. 483. She further concluded that, while the evidence before the ALJ who denied Cox's 2004 claim was not sufficient to establish statutory complicated pneumoconio-

sis, the newly submitted medical evidence showed a change in circumstances because it conclusively established that Cox suffered from the condition. She therefore held that Cox was entitled to benefits under the Act. On April 1, 2008, the ALJ issued an order granting an award of $9,775.00 in fees to be paid by Westmoreland for Cox's attorney, Joseph Wolfe, and his staff.

Westmoreland appealed both orders to the BRB. On January 27, 2009, the BRB issued a Decision and Order affirming the award of benefits and the award of fees. This petition for review followed.

## II.

Westmoreland makes five assertions of error with regard to the ALJ's decision. First, Westmoreland argues that the ALJ misapplied the relevant legal standard by shifting the burden to Westmoreland to show that Cox did not suffer from statutory complicated pneumoconiosis. Second, Westmoreland asserts that the ALJ's decision was not supported by substantial evidence because she based her finding on one biopsy result from 2005, which did not show statutory complicated pneumoconiosis. Third, Westmoreland argues that the ALJ erred in excluding the opinions of Westmoreland's experts who found that the opacities were due to diseases other than pneumoconiosis. Fourth, Westmoreland contends that the ALJ erred in failing to consider evidence predating Cox's 2004 claim. Finally, Westmoreland argues that the ALJ erred in her calculation of the reasonable hourly rate for Cox's attorney. We address each contention below.

On appeal, "we must affirm the decision of the ALJ if it is in accordance with law and is supported by substantial evidence." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 756 (4th Cir. 1999). "We review the ALJ's and the Board's conclusions of law de novo to determine whether they are rational and consistent with applicable law." *Milburn Colliery Co. v.*

*Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). In determining whether the evidence supporting the decision is substantial, we evaluate whether it is "of sufficient quality and quantity as a reasonable mind might accept as adequate to support the finding under review." *Piney*, 176 F.3d at 756 (internal quotations omitted). "An ALJ's award of attorney's fees is discretionary, and will be upheld on appeal unless arbitrary, capricious, an abuse of discretion, or contrary to law." *Kerns v. Consolidation Coal Co.*, 176 F.3d 802, 804 (4th Cir. 1999).

## A.

We turn first to Westmoreland's assertion that the ALJ applied the wrong legal standard by shifting the burden to Westmoreland to disprove the existence of statutory complicated pneumoconiosis. The Act mandates "payments of benefits in respect of total disability of any miner due to pneumoconiosis." 30 U.S.C. § 921(a). To be eligible for those benefits, a claimant must establish (1) the existence of pneumoconiosis, (2) that the pneumoconiosis arose out of coal mine employment, and (3) that the pneumoconiosis is totally disabling.[5] *See* 30 U.S.C. §§ 901, 921; 20 C.F.R. §§ 718.202-204, 725.202. Prongs 1 and 3 can both be satisfied by the application of a statutory presumption under 30 U.S.C. § 921(c)(3). As mentioned above, that section applies an irrebuttable presumption that the claimant is totally disabled due to pneumoconiosis if he is suffering:

> from a chronic dust disease of the lung which (A) when diagnosed by chest [x-ray], yields one or more large opacities (greater than one centimeter in diam-

---

[5]There is no dispute in this case that Cox successfully established the second factor above. Under 30 U.S.C. § 921(c)(1), "[i]f a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment." Cox worked as a coal miner for over thirty years and was therefore entitled to the presumption, which Westmoreland has not attempted to rebut.

eter) . . . , (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B).

30 U.S.C. § 921(c)(3). The condition described by § 921(c)(3) is known as statutory "complicated pneumoconiosis." *Double B Mining, Inc. v. Blankenship*, 177 F.3d 240, 242-43 (4th Cir. 1999).

This court has previously made clear that, throughout the claim adjudication process, "[t]he claimant retains the burden of proving the existence of" statutory complicated pneumoconiosis. *Lester v. Dir., OWCP*, 993 F.2d 1143, 1146 (4th Cir. 1993). We have also set out a detailed legal framework for establishing the irrebuttable presumption of § 921(c)(3). In, *Eastern Associated Coal Corp. v. Director, OWCP, ("Scarbro")*, 220 F.3d 250 (4th Cir. 2000), we explained:

Prongs (A), (B), and (C) are stated in the disjunctive; therefore a finding of statutory complicated pneumoconiosis may be based on evidence presented under a single prong. But the ALJ must in every case review the evidence under each prong of § 921(c)(3) for which relevant evidence is presented to determine whether complicated pneumoconiosis is present. . . . Thus, even where some x-ray evidence indicates opacities that would satisfy the requirements of prong (A), if other x-ray evidence is available or if evidence is available that is relevant to an analysis under prong (B) or prong (C), then all of the evidence must be considered and evaluated to determine whether the evidence as a whole indicates a condition of such severity that it would produce opacities greater than one centimeter in diameter on an x-ray.

*Id.* at 256 (internal citations omitted).

Westmoreland asserts that the ALJ erred in her application of the law because, instead of placing the burden on Cox to prove the existence of complicated pneumoconiosis, she placed the burden on Westmoreland to prove that the opacities seen in the evidence were not due to pneumoconiosis. In support of its position, Westmoreland cites the following passage from the ALJ's opinion:

> In addition to establishing the existence of a one centimeter[6] or greater opacity, [§ 921(c)(3)][7] requires that the etiology of these opacities be coal-dust related. Under *Scarbro*, once the Claimant establishes this etiology, the Employer must provide evidence that affirmatively shows the opacities are not there or that they are from a disease process other than complicated pneumoconiosis.

J.A. 477 (footnote call numbers added). According to Westmoreland, this language shows that the ALJ interpreted *Scarbro* as holding that, once the claimant presented x-ray evidence of a large opacity "the burden shifts to the employer to rule out the existence of complicated pneumoconiosis." Petitioner's Br. at 18. We are not persuaded by Westmoreland's interpretation of the ALJ's language.

---

[6]Westmoreland argues that the ALJ erred in finding that the statutory presumption required evidence "of a one centimeter or greater opacity," J.A. 477, when in actuality it requires evidence of opacities "greater than one centimeter in diameter," 30 U.S.C. § 921(c)(3). Although Westmoreland is correct in this assertion, we agree with the BRB's finding that this error is harmless "because the physicians, including those designated by employer, agree that the opacity seen on claimant's x-rays is greater than one centimeter in diameter." J.A. 497 n.8. In fact all the relevant evidence showed that the opacity measured more than three centimeters.

[7]The ALJ consistently referred to the statutory presumption at issue as being pursuant to 20 C.F.R. § 718.304. 20 C.F.R. § 718.304 is the regulation that implements the presumption established by 30 U.S.C. § 921(c)(3). The two provisions contain the same language.

The passage of the ALJ's opinion quoted above is consistent with our statement in *Scarbro* that:

> [I]f the x-ray evidence vividly displays opacities exceeding one centimeter, its probative force is not reduced because the evidence under some other prong is inconclusive or less vivid. Instead, the x-ray evidence can lose force only if other evidence *affirmatively shows* that the opacities are not there or are not what they seem to be, perhaps because of an intervening pathology, some technical problem . . . , or incompetence of the reader.

*Scarbro*, 220 F.3d at 256 (emphasis added). In following this language in *Scarbro*, the ALJ did not, as Westmoreland suggests, require Westmoreland to prove that the opacities were due to something other than pneumoconiosis.[8] She simply stated that the clear evidence of large opacities would support the presumption unless the record contained "affirmative evidence" showing either that the opacities did not exist or that they were due to something else, such as a disease other than pneumoconiosis. She highlighted throughout her opinion that "[t]he claimant has the burden of proving the existence of pneumoconiosis, as well as every element of entitlement, by

---

[8]Westmoreland claims that the ALJ's approach is identical to what this court found impermissible in our unpublished opinion in *Clinchfield Coal Co. v. Lambert*, 206 F. App'x 252 (4th Cir. 2006) (per curiam). However, in that case, the court remanded the ALJ's decision because the ALJ misinterpreted *Scarbro* as requiring that the employer's evidence "'persuasively establish' (as opposed to 'affirmatively show')" that the opacities did not exist or were due to a disease other than pneumoconiosis. *Id.* at 255. The court found that this approach misapplied the law by shifting the burden of persuasion to the employer rather than requiring mere production of affirmative evidence. In the present case there is no evidence that the ALJ tasked Westmoreland with persuading her that the opacities were due to something other than pneumoconiosis. Rather, she found that Westmoreland had not presented any affirmative evidence supporting that assertion. Her approach was therefore consistent with *Scarbro* and did not mistakenly shift the burden of persuasion to Westmoreland.

a preponderance of the evidence." J.A. 473. She further noted that, in addition to showing that the opacities existed, Cox "must also establish that they are due to pneumoconiosis." J.A. 479.

The ALJ's opinion makes clear that she found the presumption established not because she had placed any unmet burden on Westmoreland, but rather because the evidence in the record did not "amount to *affirmative evidence* sufficient to cause [Cox's] evidence satisfying [§ 921(c)(3)] . . . to lose force." J.A. 483. This approach is consistent with *Scarbro* and therefore legally proper.

### B.

Next we consider Westmoreland's argument that the ALJ's decision was not supported by substantial evidence. Westmoreland reasons that the "ALJ found the 2005 biopsy was sufficient to diangos[e] complicated pneumoconiosis," but the biopsy alone did not establish statutory complicated pneumoconiosis because it did not show opacities measuring more than one centimeter. Petitioner's Br. at 27.

Westmoreland misinterprets the ALJ's analysis. While the ALJ did state that the 2005 biopsy established that Cox suffered from pneumoconiosis under 20 C.F.R. § 718.202(a),[9] she did not state that it was sufficient to establish statutory complicated pneumoconiosis pursuant to 30 U.S.C. § 921(c)(3). The ALJ made it clear in her opinion that she was basing her award of benefits *not* on 20 C.F.R. § 718.202(a)(2), but rather on the statutory "presumption of

---

[9]20 C.F.R. § 718.202(a) does not require that the evidence show opacities of any particular size. It simply states: "A biopsy or autopsy conducted and reported in compliance with § 718.106 may be the basis for a finding of the existence of pneumoconiosis." 20 C.F.R. § 718.202(a)(2). Unlike a claimant proceeding under the presumption of 30 U.S.C. § 921(c)(3), a claimant establishing pneumoconiosis under 20 C.F.R. § 718.202(a) must separately show that he is totally disabled as a result of the disease.

total disability due to complicated pneumoconiosis" of 30 U.S.C. § 921(c)(3). J.A. 483. Therefore, contrary to Westmoreland's assertion, her finding that the biopsy was sufficient to satisfy 20 C.F.R. § 718.202(a)(2) does not imply that she found the biopsy alone to be sufficient to establish the presumption of statutory complicated pneumoconiosis under 30 U.S.C. § 921(c)(3).

In fact, the ALJ's finding of statutory complicated pneumoconiosis was based on all of the available medical evidence, not just the 2005 biopsy. In her evaluation of the evidence under § 921(c)(3), the ALJ found that "there [was] no dispute that [Cox] has large masses in his lungs, and that these masses show as opacities of at least one [centimeter] on his x-rays." J.A. 479. Indeed, there was no dispute that the x-rays showed at least one mass measuring more than three centimeters in the upper part of Cox's right lung. This finding was also supported by several CT scans and other medical tests. Westmoreland's experts did not dispute the existence of a large mass. Instead, they asserted that the mass was likely due to one of a number of other possible diseases. The ALJ rejected their conclusions as equivocal and speculative, and found that they did not constitute affirmative evidence sufficient to show that the opacities were not due to pneumoconiosis. As we explain in section II.C below, that finding was proper. The ALJ also reasoned that because the 2005 biopsy showed signs of pneumoconiosis or cancer, and cancer had since been ruled out, the record strongly indicated that pneumoconiosis was what caused the opacities found in Cox's tests. Finally, the ALJ noted that none of Westmoreland's experts had reviewed the 2005 biopsy or questioned its results.

Following her detailed evaluation of the evidence, the ALJ stated:

> Upon reviewing all of the evidence together, I find that [Cox] has established that he is entitled to the presumption of total disability due to complicated

pneumoconiosis. I find that the preponderance of the persuasive evidence establish[ed] that [Cox] has a condition that has resulted in the presence of a large opacity on x-ray, due to his more than thirty years of occupational exposure to coal dust.

J.A. 483. Thus, contrary to Westmoreland's assertion, it is clear from the ALJ's opinion that her conclusion was based not on the 2005 biopsy, but rather on an evaluation of all of the evidence before her. This approach was legally proper under *Scarbro*. *See Scarbro*, 220 F.3d at 256 (explaining that, in the ALJ's analysis of whether the claimant established the § 921(c)(3) presumption, "all of the evidence must be considered and evaluated to determine whether the evidence as a whole indicates a condition of such severity that it would produce opacities greater than one centimeter in diameter on an x-ray").

Upon reviewing all the relevant evidence, the ALJ found that the consistent x-ray evidence of large opacities, when considered in light of the other evidence of pneumoconiosis including CT scans, medical interpretations, and the 2005 biopsy, was sufficient to establish statutory complicated pneumoconiosis under § 921(c)(3). We find that the evidence in the record is certainly "of sufficient quality and quantity as a reasonable mind might accept as adequate to support" that finding. *Piney*, 176 F.3d at 756 (internal quotations omitted). The finding is therefore supported by substantial evidence.

## C.

Next we consider Westmoreland's argument that the ALJ incorrectly disregarded the opinions of Westmoreland's experts. Westmoreland asserts that the ALJ erred in finding that Westmoreland did not present affirmative evidence showing that the opacities shown in the x-rays were due to a disease other than pneumoconiosis. Specifically, it argues that she erred in rejecting the opinions of Westmoreland's experts

finding that the opacities were likely due to tuberculosis, histoplasmosis, granulomatous disease, or sarcoidosis. We disagree.

The ALJ discussed the opinions of each of Westmoreland's experts who said the opacities might be due to something other than pneumoconiosis. Dr. Scott believed that the masses were likely due to tuberculosis or histoplasmosis because they had no background of small rounded opacities. Dr. Hippensteel thought they were likely due to histoplasmosis or to a non-infectious granulomatous disease because they showed calcification and changes in size. Dr. Wiot opined that the opacities could be due to sarcoidosis. None of the doctors discussed whether any of the diseases could occur in conjunction with pneumoconiosis. In addition, none of them pointed to evidence that Cox was suffering from any of the alternative diseases mentioned or discussed whether the tests showed any signs inconsistent with those diseases. Finally, none of the doctors reviewed or opined upon the results of the 2005 biopsy.

The ALJ made the following findings about Westmoreland's experts' opinions:

> I give little weight to the opinions of Dr. Hippensteel, Dr. Rosenberg, and Dr. Wiot, whose views are based on a limited and selective review of the new medical evidence, and who, in the case of Dr. Hippensteel and Dr. Rosenberg, have not adequately explained how their conclusions are supported by the objective medical evidence. . . .
>
>      . . . .
>
> I find the interpretations of Dr. Wheeler, Dr. Scott, and Dr. Wiot, as well as the opinions by Dr. Rosenberg, to be speculative regarding the etiology of the large masses . . . . [T]he Employer's physicians

merely speculated that the large masses . . . were attributable to another disease process, without substantiation or corroboration, and without consideration of critical medical evidence bearing on this issue. . . . [They] speculate without basis that [the] . . . objective evidence must be due to something other than pneumoconiosis.

These interpretations are equivocal, in that they do not make a diagnosis or an "objective determination," but instead speculate on the various possible etiologies for the abnormalities or masses that they acknowledge are there.

J.A. 482-83.[10] The ALJ therefore found that, because they were speculative and equivocal, these opinions did not constitute affirmative evidence sufficient to show that the opacities seen in the medical exams were due to something other than pneumoconiosis.

We previously affirmed the BRB's approval of a very similar approach by the same ALJ who authored the opinion at issue in this case. In *Barker v. Westmoreland Coal Co., OWCP*, BRB No. 03-0553 BLA (May 28, 2004), as here, the ALJ similarly rejected the opinions of several of the same experts that presented evidence in this case, including Drs. Wheeler, Scott, Scatarige, and Hippensteel. As in this case, the doctors opined in *Barker* that the opacities present in the claimant's medical evidence were due to diseases other than pneumoconiosis. Drs. Scott, Scatarige, and Wheeler all thought the opacities were due to tuberculosis. In a very similar diagnosis to the one he gave in this case, Dr. Hippensteel suspected that the opacities were due to granulomatous dis-

---

[10]The ALJ also expressed skepticism regarding the opinion of one of Cox's doctors, Dr. Forehand, stating: "I do not give significant weight to the conclusions of Dr. Forehand, who relied solely on his interpretation of [Cox's] x-rays, and the 2002 biopsy results." J.A. 482 n.12.

ease because they showed signs of calcification and of size changes.

In *Barker*, the ALJ rejected the evidence as speculative because there was no evidence in the record showing that the claimant had any of the alternative diseases. She therefore found that the experts' opinions did not constitute affirmative evidence sufficient to weaken the claimant's x-ray evidence showing large opacities that satisfied the statutory definition of complicated pneumoconiosis.

The BRB approved the ALJ's reasoning, stating:

> [T]he administrative law judge found the opinions of Drs. Wheeler, Scott, Scatarige, and Hippensteel to be equivocal as to the cause of the opacities seen on claimant's x-ray because they attributed the cause of the opacities to tuberculosis or granulomatous disease when there was no evidence in the record that claimant had ever suffered from or been exposed to tuberculosis, or other inflammatory process, or other disease process. Employer does not dispute that statement. The administrative law judge, therefore, properly rejected the evidence pointing to causes, other than coal mine employment, for the abnormalities seen on claimant's x-rays. . . . Accordingly, we affirm the administrative law judge's findings that claimant had complicated pneumoconiosis and that the cause of claimant's complicated pneumoconiosis was coal mine employment.

*Id.* at *5 (internal citations and footnote call number omitted). We later affirmed the BRB's decision in an unpublished opinion, stating: "The BRB affirmed the ALJ's decision as rational, supported by substantial evidence, and in accordance with applicable law. After considering the joint appendix, the briefs, and the arguments of counsel, we find no reversible

error." *Westmoreland Coal Co. v. Barker*, 136 F. App'x 583, 584 (4th Cir. 2005) (per curiam).

As was the case in *Barker*, Westmoreland's evidence here consisted of speculative alternative diagnoses that were not based on evidence that Cox suffered from any of the diseases suggested. Thus, we find that the ALJ's conclusion here was consistent with the BRB's guidance in *Barker*. The ALJ acted well within her discretion to reject opinions that she found to be "unsupported by a sufficient rationale." *Hicks*, 138 F.3d at 533; *Risher v. OWCP*, 940 F.2d 327, 331 (8th Cir. 1991) ("An ALJ may disregard a medical opinion that does not adequately explain the basis for its conclusion."). Accordingly, the ALJ did not err in rejecting the experts' opinions at issue.

D.

Next we consider Westmoreland's argument that the ALJ wrongly failed to consider evidence predating Cox's 2004 claim. Because Cox's initial claim for benefits had been denied more than a full year before he filed his 2005 claim, his second claim was a "subsequent claim" under the Act. 20 C.F.R. § 725.309(d). As a result, Cox was required to show that "one of the applicable conditions of entitlement . . . ha[d] changed since the date upon which the order denying the prior claim became final." *Id.* Westmoreland argues that the ALJ erred in determining that Cox met this burden because she failed to consider the evidence presented at the time of Cox's 2004 claim.

Westmoreland asserts that, in failing to consider the pre-denial evidence, the ALJ violated the requirement established by *Lisa Lee Mines v. Director, OWCP*, 57 F.3d 402 (4th Cir. 1995), *vacated, reh'g granted*, 1995 U.S. App. LEXIS 32069 (4th Cir. Nov. 16, 1995), that the ALJ "consider whether all of the evidence in the record, including the evidence predating the denial of the prior claim, supports a finding of entitlement to benefits." *Id.* at 406. The panel opinion cited by Westmore-

land was subsequently vacated by this court, and the case was reheard en banc.[11] The en banc opinion does not mention the requirement noted by Westmoreland. In fact, the opinion declines to endorse a similar requirement. *See Lisa Lee Mines v. Dir., OWCP*, 86 F.3d 1358, 1363 n.11 (4th Cir. 1996) (en banc) ("We do not endorse, however, the closing paragraph of [*Sharondale Corp. v. Ross*, 42 F.3d 993 (6th Cir. 1994)], where . . . the Sixth Circuit seems to have required consideration of the evidence behind the earlier denial to determine whether it 'differs qualitatively' from the new evidence.") (alterations in original omitted).

We do agree with Westmoreland, however, that 20 C.F.R. § 725.309 indicates that the ALJ should consider evidence submitted in connection with the prior claim. 20 C.F.R. § 725.309(d)(1) states: "Any evidence submitted in connection with any prior claim shall be made a part of the record in the subsequent claim, provided that it was not excluded in the adjudication of the prior claim." Because the ALJ must review the entire record before making a determination, *see Scarbro*, 220 F.3d at 256, it follows that she must also take into account the existence of any pre-denial evidence.

We find that the ALJ in this case did consider such evidence. The ALJ specifically referred to the evidence presented in the prior claim. She found that, while that evidence

---

[11]Westmoreland incorrectly asserts that the Department of Labor's comments to the revised version of 20 C.F.R. § 725.309 show that section codified the quoted language of *Lisa Lee*, 57 F.3d 402, the vacated opinion. The comments do not so indicate. Instead, the comments explain that the amendments "effectuated the Fourth Circuit's decision in *Lisa Lee Mines v. Director, OWCP*, 86 F.3d 1358 (4th Cir. 1996), *cert. denied*, 117 S. Ct. 763 (1997)," the en banc opinion, by instituting "a threshold test which allowed the miner to litigate his entitlement to benefits without regard to any previous findings by producing new evidence that established any of the elements of entitlement previously resolved against him." Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79920, 79968 (Dec. 20, 2000) (codified at 20 C.F.R. pts. 718, 722, 725, 726, 727).

"was not sufficient to support a finding of complicated pneumoconiosis, it is consistent with . . . the findings of [Cox's] physicians, and [her] conclusions on reviewing the newly submitted medical evidence" that Cox had since established statutory complicated pneumoconiosis. J.A. 484. Therefore we find that the ALJ fulfilled her obligation of considering all the evidence, including the pre-denial evidence.

E.

Finally, we consider Westmoreland's argument that the ALJ improperly calculated the award of attorney's fees. Westmoreland asserts that the ALJ erred by failing to base the award on the prevailing hourly rate for the work of Joseph Wolfe, Cox's counsel. Although an ALJ's discretion in crafting an appropriate fee award is broad, and the fee here is not unreasonable in sum, we are constrained to agree. We find that the ALJ abused her discretion in not explicitly establishing a prevailing hourly rate as the guide for her analysis. *See Kerns*, 176 F.3d at 804 ("An ALJ's award of attorney's fees is discretionary, and will be upheld on appeal unless arbitrary, capricious, an abuse of discretion, or contrary to law.").

In support for his petition for fees, Wolfe relied on the Altman Weil Survey of Law Firm Economics (2006), which lists the hourly rates for attorneys in the South Atlantic Region and the Middle Atlantic Region. Wolfe stated that "he knew of no other attorneys who currently handle black lung work in Virginia or take new cases in this area of law." J.A. 488. He also "described the practice area as very limited, and explained how it is almost impossible to find attorneys who perform this work." *Id.*

The ALJ seemed unconvinced that the Altman Weil survey was an accurate indicator of the prevailing hourly rate for Wolfe's work. She stated:

> I note that the range of hourly rates set out by Mr. Wolfe covers the span between the median and the

ninth decile rates; it does not include the lower quar-
tile hourly rates. Additionally the "South Atlantic
Region" and "Middle Atlantic Region" encompass a
wide geographic area, which includes many large
metropolitan areas. There is no indication that the
survey figures used by Mr. Wolfe include only attor-
neys who practice in the black lung area or whether
they include attorneys who practice in all areas of
the law.

J.A. 490. In spite of her apparent view that Wolfe had not
established a prevailing rate applicable to his work, she none-
theless determined a reasonable rate on her own, taking into
account, among other factors, "the low rates of success for
claimants in black lung litigation" and "the contingent nature
of the attorneys' fees." *Id.*

We have previously detailed the fee applicant's burden in
establishing a reasonable hourly rate in the fee-shifting con-
text. In *Plyler v. Evatt*, 902 F.2d 273 (4th Cir. 1990), we
stated:

[D]etermination of the hourly rate will generally be
the critical inquiry in setting the "reasonable fee,"
and the burden rests with the fee applicant to estab-
lish the reasonableness of a requested rate. In addi-
tion to the attorney's own affidavits, the fee
applicant must produce satisfactory specific evi-
dence of the prevailing market rates in the relevant
community for the type of work for which he seeks
an award. Although the determination of a "market
rate" in the legal profession is inherently problem-
atic, as wide variations in skill and reputation render
the usual laws of supply and demand largely inappli-
cable, the Court has nonetheless emphasized that
market rate should guide the fee inquiry.

*Id.* at 277 (internal citations and quotations omitted). We have
also noted that "[t]he market rate should be determined by

evidence of what attorneys earn from paying clients for similar services in similar circumstances, which, of course, may include evidence of what the plaintiff's attorney actually charged his client." *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007) (internal quotation omitted).

We recently revisited this issue in *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235, 245 (4th Cir. 2009), where we found that a district court abused its discretion in failing to determine a prevailing market rate when awarding attorneys' fees. The *Robinson* court explained:

> Although we recognize that the district court authored a very thorough memorandum opinion, we nonetheless conclude that it abused its discretion by awarding the hourly rates requested by [plaintiff] in the absence of "satisfactory specific evidence of the prevailing market rates. . . ." *Plyler*, 902 F.2d at 277. . . . Examples of the type of specific evidence that we have held is sufficient to verify the prevailing market rates are affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community. In this case, . . . [plaintiff] offered no specific evidence that the hourly rates sought for [plaintiff's] attorneys coincided with the then prevailing market rates of attorneys in the Eastern District of Virginia of similar skill and for similar work, which our case law required [plaintiff] to do.

*Id.* at 245 (internal citations and quotations omitted).

We find that, like the district court in *Robinson*, the ALJ here erred by determining a reasonable hourly rate "in the absence of 'satisfactory specific evidence of the prevailing market rates.'" *Id.* (quoting *Plyler*, 902 F.2d at 277). We do not question, as Wolfe explained and the ALJ implicitly

accepted, that there are few other attorneys doing similar work in the same area. The highly regulated markets governed by fee-shifting statutes are undoubtedly constrained and atypical. Under our precedent, however, that does not excuse the need to ascertain a reasonable prevailing rate. *See Plyler*, 902 F.2d at 277. We have recognized a range of sources from which to draw. For example, Wolfe could have submitted evidence of the fees he has received in the past, *see Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994), or affidavits of other lawyers who might not practice black lung law, but who "are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community," *Robinson*, 560 F.3d at 245. Furthermore, the ALJ here need not have limited her consideration to fees in black lung cases; other administrative proceedings of similar complexity would also yield instructive information. Accordingly, we find that the ALJ erred in excusing Wolfe from his well-established burden to provide evidence of an applicable prevailing rate as a starting point for the attorney's fees analysis.[12] We therefore vacate the fee

---

[12]Westmoreland argues that the ALJ also erred in providing a higher hourly rate based on risk of loss. We note that once a prevailing market rate is established, that rate is presumed to incorporate considerations of risk of loss. As the Supreme Court explained in *City of Burlington v. Dague*, 505 U.S. 557 (1992):

> The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor . . . is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. . . .

> The first factor . . . should play no part in the calculation of the [attorney's fees] award.

*Id.* at 562-63 (citing *Blum v. Stenson*, 465 U.S. 886, 898-99 (1984)); *see also Helton v. Dir., OWCP*, 6 B.L.A. 1-176 (1983) (stating that "risk of loss is always present and is considered to be incorporated into and is evaluated as so incorporated in the hourly rate charged by counsel").

award and remand this matter for further proceedings consistent with this opinion.

### III.

For the reasons stated above, the BRB's decision affirming the ALJ's orders is

> *AFFIRMED IN PART,*
> *VACATED IN PART,*
> *AND REMANDED.*

---

Therefore, the prevailing hourly rate for Wolfe's work will presumably already reflect risk of loss considerations. As such, it would be duplicative to take into account risk of loss as a separate factor in determining the final hourly rate to be awarded. *See B&G Mining, Inc. v. Dir., OWCP*, 522 F.3d 657, 666 (6th Cir. 2008) (holding that, because, "Federal courts and the BRB have all recognized that compensation for the risk of loss is already factored into any reasonable hourly rate" it would be "plainly wrong" for an adjudicator in a black lung case to "consider the risk of loss in these types of claims when determining a reasonable rate"); *see also Peabody Coal Co. v. McCandless*, 255 F.3d 465, 470 (7th Cir. 2001) (finding that, under *Dague*, "the rate chargeable against the mine operator must be market-based, . . . without a premium for the contingent nature of the compensation") (internal citation omitted).

That is not to say, however, that the ALJ might not adjust the prevailing rate to account for other non-duplicative factors. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183-84 (2d Cir. 2008) ("While the district court should generally use the prevailing hourly rate in the district where it sits . . . the district court may adjust this base hourly rate to account for . . . case-specific variables.").