**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1317

WEST VIRGINIA COAL WORKERS' PNEUMOCONIOSIS FUND, as a carrier
for Mountain Laurel Coal Company,

Petitioner,

v.

DONALD R. BELL, SR.; DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF
LABOR,

Respondents.

On Petition for Review of an Order of the Benefits Review Board. (17−0175−BLA)

Argued: January 29, 2019                    Decided: August 6, 2019

Before THACKER and RICHARDSON, Circuit Judges, and TRAXLER, Senior Circuit
Judge.

Petition granted by unpublished opinion. Judge Richardson wrote a separate opinion and
announced the judgment. Judge Traxler wrote an opinion concurring in the judgment.
Judge Thacker wrote a dissenting opinion.

**ARGUED:** Jeffrey Robert Soukup, JACKSON KELLY, PLLC, Lexington, Kentucky,
for Petitioner. S.F. Raymond Smith, Charleston, West Virginia; Barry H. Joyner,
UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

**ON BRIEF:** Kate S. O'Scannlain, Solicitor of Labor, Kevin L. Lyskowski, Acting Associate Solicitor, Gary K. Stearman, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

_____

Unpublished opinions are not binding precedent in this circuit.

RICHARDSON, Circuit Judge, writing separately and announcing the judgment:

Respondent Donald R. Bell, Sr., is a former coal miner who left that line of work in 1984. He is also a heavy smoker: he smoked as many as two packs of cigarettes per day for over 50 years, although by 2012 he was down to a pack and a half. He suffers from lung problems and constantly uses oxygen as prescribed by his doctors.

In 2010, Bell applied for benefits available to coal miners with pneumoconiosis, a term that refers to several medical conditions but is colloquially called black lung disease. Petitioner West Virginia Coal Workers' Pneumoconiosis Fund (the "CWP Fund"), which is on the hook for any benefit payments to Bell, opposed his request. The case turned into a classic battle of the experts: Bell's expert said that his lung problems were caused largely by his exposure to coal dust, while the CWP Fund's experts attributed Bell's health problems to his smoking.

Bell's case was assigned to a Department of Labor Administrative Law Judge, Kenneth A. Krantz. Judge Krantz found the CWP Fund's experts more persuasive and denied Bell's request for benefits. Bell appealed to the Benefits Review Board, which vacated that decision and remanded for further consideration. After Judge Krantz reaffirmed his earlier decision, the Board again vacated and remanded. The case was then reassigned to another ALJ, Paul C. Johnson, Jr. Judge Johnson took a different view of the facts and sided with Bell. This time, the Board affirmed. The CWP Fund argues that the Board erred in vacating Judge Krantz's decisions denying benefits, and asks us to reinstate them.

3

This case raises several issues. First, I must determine whether this court may review the Board's prior, interlocutory orders. If the answer is yes, then I must also determine whether the Respondents have forfeited their case: both Bell and the Director of the Office of Workers' Compensation Programs, who has sided with Bell, have failed to defend the Board's interlocutory orders on appeal. And if I get past those hurdles, I reach the merits.

I conclude that we have jurisdiction to review the Board's interlocutory orders. I also conclude that although Bell and the Director have forfeited their response to the CWP Fund's chief arguments, the court should overlook that forfeiture in part. Finally, I conclude that the Board erred in vacating Judge Krantz's decisions. By statute, the Board is bound by an ALJ's factual findings so long as they are supported by substantial evidence. While the Board found that Judge Krantz had erred, those purported errors did not warrant vacating his decisions under the substantial-evidence standard. Under the circumstances of this case, the correct remedy is to grant the CWP Fund's petition for review and order the Board to reinstate Judge Krantz's denial of benefits.

## I.

### A.

Bell worked as a coal miner for over 15 years, until 1984. He then became a truck driver. He retired in 2008 at the age of 63. Throughout his adult life, Bell was a heavy smoker. He smoked two packs of cigarettes daily for over 50 years. By the time of his retirement, Bell had significant respiratory problems. He has reported frequent colds as well as multiple bouts of pneumonia, some of which required hospitalization.

4

In 2008, while Bell was in the hospital, one of his doctors told him that he had black lung disease. In 2010, Bell submitted a claim for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.* His application for benefits rested largely on a report prepared by a board-certified allergist and pediatrician, Dr. Forehand. Dr. Forehand concluded that Bell suffered from a respiratory disability caused primarily by coal-dust exposure and to a lesser extent by smoking. He based this conclusion on a review of Bell's medical history, a physical examination, and several tests he performed in October 2010: a ventilatory study (that is, a test of Bell's lung function), an arterial blood-gas study (that is, an analysis of the levels of carbon dioxide, oxygen, and acidity in Bell's blood), and a chest x-ray. This chest x-ray became a key piece of evidence in Bell's case. Dr. Forehand concluded that the 2010 x-ray showed large opacities (that is, bright spots) in Bell's lungs that were characteristic of pneumoconiosis. Dr. Forehand is a certified "B reader," which means he has demonstrated proficiency in reviewing x-rays for signs of pneumoconiosis. *See generally Adkins v. Director, OWCP*, 958 F.2d 49, 51 n.2 (4th Cir. 1992) (explaining definition of "B reader").

In response to Bell's application for benefits, the CWP Fund engaged its own medical experts. These experts concluded that Bell did not suffer from pneumoconiosis, for several reasons. First, two of the CWP Fund's experts disagreed with Dr. Forehand's interpretation of the 2010 x-ray. These experts were Dr. Shipley (a board-certified radiologist) and Dr. Castle (a board-certified pulmonologist), who like Dr. Forehand are also "B readers." Both doctors found no large opacities characteristic of pneumoconiosis on the 2010 x-ray, although they did note certain irregularities in the middle of Bell's

5

lungs.  Dr. Shipley explained that, "[b]ecause of the absence of background small rounded opacities, these are unlikely to represent large opacities of pneumoconiosis. Comparison with any prior or subsequent radiographs should be considered to rule out malignancy."  J.A. 15.  Dr. Castle opined that the "middle lung zone[] . . . is not where you find large opacities of pneumoconiosis, and those did not have the characteristic appearance of pneumoconiosis.  Those opacities . . . were most likely due to previous scarring from inflammation or infection."  J.A. 82–83.[1]

Two of the CWP Fund's experts also reviewed the results of Bell's lung-function tests, including the tests conducted by Dr. Forehand and additional tests they performed. These experts were Dr. Castle and another pulmonologist, Dr. Ghio.  Dr. Ghio concluded, using the guidelines of the American Thoracic Society, that Bell's breathing was not "impaired," just at the low end of the normal range.  Dr. Castle offered a different opinion:  he found that Bell's breathing was impaired, but in three ways uncharacteristic of black lung disease.  First, Dr. Castle found "mild to moderate airway obstruction without restriction."  J.A. 24.  Second, he found that Bell's lung function had varied over time, sometimes getting worse and sometimes getting better.  In his view, these two findings suggested Bell did not have pneumoconiosis, which "generally" causes "a mixed, irreversible obstructive and restrictive ventilatory defect."  *Id.*  Dr. Castle also

---

[1] Doctors also took additional chest x-rays and CT scans, but these materials ultimately did not play an important role in the case.

6

found that, when Bell exhaled, air remained in his lungs. Such "gas trapping," in Dr. Castle's opinion, typically resulted from smoking, not coal-dust exposure. J.A. 85–86.

Dr. Ghio and Dr. Castle also reviewed the results of arterial blood-gas tests (again, both the results obtained by Dr. Forehand and results from additional testing). Both experts concluded that these results also suggested smoking-related disease rather than black lung: the testing showed low levels of oxygen and high levels of carbon dioxide, a combination not typical of black lung disease.

**B.**

In 2012, Judge Krantz held a hearing on Bell's claim. Only Bell testified in person before Judge Krantz; the parties otherwise relied on the documentary evidence and deposition transcripts. Bell explained that he had to use oxygen "24/7" and that, despite his doctors' advice to quit smoking, he was only down to a "pack and a half a day." J.A. 134.

In 2013, Judge Krantz issued a decision rejecting Bell's claim for benefits. He began by making several factual findings that are not disputed. He found that Bell had worked for just over 15 years as a coal miner for the Mountain Laurel Resources Company (represented by the CWP Fund, its insurance carrier, in this appeal). Judge Krantz also found that Bell had a smoking history of approximately 100 "pack years" (meaning he smoked, on average, about two packs a day for a period of about fifty years). J.A. 153–54. Judge Krantz further concluded that Bell had a totally disabling respiratory condition. While Judge Krantz credited Dr. Ghio's opinion that Bell did not have a respiratory disability, he found it was outweighed by other evidence in the record.

7

Next, Judge Krantz found that Bell does not have pneumoconiosis—the key finding at issue in this appeal. He analyzed this issue in two steps, each of which related to a different presumption afforded by the black lung statute.

Judge Krantz first considered whether Bell was entitled to an irrebuttable presumption that he was disabled due to pneumoconiosis. A coal miner is entitled by statute to this irrebuttable presumption if he shows that he is suffering "from a chronic dust disease of the lung which (A) when diagnosed by chest [x-ray], yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization . . . ." 30 U.S.C. § 921(c)(3).[2]

Judge Krantz found that Bell was not entitled to the irrebuttable presumption. To establish this presumption, Bell relied solely on the 2010 chest x-ray, which according to Dr. Forehand contained large opacities that qualified under the statute. Judge Krantz, however, gave the greatest weight to Dr. Shipley's contrary interpretation. He reasoned that Dr. Shipley was the best-qualified expert because he alone was a board-certified radiologist.

Judge Krantz next considered whether Bell was entitled to a rebuttable presumption that he was disabled due to pneumoconiosis. A miner is entitled to such a rebuttable presumption if he shows that he worked as a coal miner for at least 15 years

_____

[2] Prongs (B) and (C) of the statute go on to provide other bases to establish the irrebuttable presumption, but Bell did not rely on them.

8

and has a totally disabling respiratory or pulmonary impairment. 30 U.S.C. § 921(c)(4). An employer can then rebut that presumption by showing that the miner does not have either "clinical pneumoconiosis" or "legal pneumoconiosis." 20 C.F.R. § 718.605(d)(1)(i).[3] "Clinical pneumoconiosis" means lung diseases recognized by the medical community as being caused by exposure to coal dust. 20 C.F.R. § 718.201(a)(1). "Legal pneumoconiosis" means "any chronic lung disease or impairment and its sequelae" that is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(2), (b).

Judge Krantz found that Bell was entitled to this rebuttable presumption (a finding that is not in dispute). But he also found that the CWP Fund had rebutted it by showing that Bell did not have either clinical or legal pneumoconiosis.

On the issue of clinical pneumoconiosis, the parties again relied only on the 2010 chest x-ray. And again, Judge Krantz was persuaded by Dr. Shipley's interpretation of the x-ray, finding that the CWP Fund had shown that Bell did not have clinical pneumoconiosis.

For legal pneumoconiosis, Judge Krantz also sided with the CWP Fund. He weighed the opinions offered by Dr. Castle, Dr. Ghio, and Dr. Forehand. Starting with Dr. Castle's opinion, Judge Krantz considered an argument that it was not reliable

---

[3] Alternatively, the employer can show that "no part of the miner's respiratory or pulmonary disability was caused by pneumoconiosis." 20 C.F.R. § 718.305(d)(1)(ii). This demanding test is often called the "rule-out" standard. The CWP Fund has not raised the "rule-out" standard on appeal.

because it rested, in part, on the premise that coal workers' pneumoconiosis does not generally manifest as a purely obstructive lung disease. Judge Krantz rejected this argument and gave the most weight to Dr. Castle's opinion. J.A. 168–69 (citing *Stiltner v. Island Creek Coal Co.*, 86 F.3d 337 (4th Cir. 1996)). Judge Krantz also credited Dr. Ghio's opinion, although he was "trouble[ed]" by an error it contained: Dr. Ghio stated that Bell had never been diagnosed with a lung disease related to coal dust, when in fact Bell's treating physicians had made such a diagnosis. For that reason, Judge Krantz gave Dr. Ghio's opinion "somewhat less weight than Dr. Castle's opinion." J.A. 169. Finally, Judge Krantz gave Dr. Forehand's opinion little weight, noting among other things that he had rejected Dr. Forehand's reading of the 2010 chest x-ray. Based on his weighing of the expert opinions, Judge Krantz found that the CWP Fund had carried its burden. He therefore denied Bell's request for benefits.

## C.

Bell appealed to the Board, which vacated Judge Krantz's decision in an order issued later in 2013. The Board held that Judge Krantz had failed to adequately explain his reliance on Dr. Shipley's x-ray interpretation as required by the Administrative Procedure Act ("APA"). As already noted, Dr. Shipley identified mid-lung abnormalities that, in his view, were not "likely" to represent pneumoconiosis. The Board concluded that Dr. Shipley's interpretation could be considered speculative under our decision in *Westmoreland Coal Co. v. Cox*, 602 F.3d 276 (4th Cir. 2010). Because Judge Krantz had not considered this issue, the Board vacated his findings on the irrebuttable and rebuttable presumptions and ordered him to reconsider the evidence.

10

In 2014, Judge Krantz reaffirmed his prior decision. He concluded that Dr. Shipley's qualifying language reflected "the inherent uncertainty in medical treatment" and did not detract from Dr. Shipley's credibility. J.A. 189. After re-reviewing the evidence, he reached essentially the same conclusion he had previously.

**D.**

In 2015, the Board again vacated Judge Krantz's decision. It again questioned Judge Krantz's handling of Dr. Shipley's x-ray interpretation, concluding that Judge Krantz should have considered other evidence of masses in Bell's lungs in deciding whether Dr. Shipley was credible. The Board also found that Judge Krantz had not adequately explained his reasons for crediting Dr. Castle's and Dr. Ghio's opinions. Dr. Castle had stated that coal workers' pneumoconiosis is not "generally" a purely obstructive disease. The Board thought that this statement might be contrary to the legal definition of pneumoconiosis. Because Judge Krantz failed to analyze this issue, the Board reasoned, his opinion did not rationally explain his reliance on Dr. Castle's opinion. The Board also noted an inconsistency between Dr. Ghio's opinion, which concluded that Bell did not suffer from a totally disabling respiratory condition, and Judge Krantz's findings, which concluded that Bell did. Here too, the Board reasoned, Judge Krantz could not have given Dr. Ghio's opinion the weight he did without at least considering this inconsistency. The Board therefore vacated and remanded for reconsideration.

Meanwhile, Judge Krantz retired. So the case was reassigned to Judge Johnson when the Board sent it back for a third decision. In 2016, Judge Johnson found for Bell.

11

In so doing, he relied on many of the issues that the Board had identified: he concluded that Dr. Shipley's interpretation of the 2010 x-ray was equivocal and worthy of little weight, that Dr. Castle's opinion was not consistent with the definition of legal pneumoconiosis, and that Dr. Ghio's opinion on legal pneumoconiosis should not be afforded much weight given the inconsistency between his findings and Judge Krantz's. Judge Johnson therefore found that Bell had established the irrebuttable presumption of 30 U.S.C. § 921(c)(3), and alternatively, that the CWP Fund had failed to overcome the rebuttable presumption of 30 U.S.C. § 921(c)(4).

In 2017, the Board affirmed Judge Johnson. It began by addressing the CWP Fund's argument that it had erroneously rejected Judge Krantz's prior decisions. The Board held that it was bound by its prior orders, which were the law of the case. The Board then turned to Judge Johnson's decision. It did not address his analysis of the irrebuttable presumption. Instead, it upheld his ruling that the CWP Fund failed to overcome the rebuttable presumption that Bell had legal pneumoconiosis, finding that Judge Johnson had properly rejected Dr. Castle's opinion.

**E.**

The CWP Fund timely submitted the instant petition for review. It primarily argues that the Board erred in overturning Judge Krantz's decisions. In their response briefs, the Director and Bell largely decline to address this argument. Only Bell responds at all, and even then, he argues only that the Board's 2017 order correctly applied the law-of-the-case doctrine in declining to revisit its prior orders. Instead, the Director and

12

Bell mostly limit their briefs to the CWP Fund's alternative argument: that Judge Johnson erred in awarding benefits to Bell.

## II.

The first item of business is to determine which of the Board's three orders—from 2013, 2015, and 2017—are properly before us for review. I analyze this threshold issue in two steps. First, I consider which orders we have jurisdiction to review. I then consider whether there any nonjurisdictional reasons not to review the Board's prior orders. I conclude that we have jurisdiction over all three orders and there is no reason for us to limit our review to the Board's final, 2017 order.

## A.

The black lung statute incorporates the judicial-review provision of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq. See* 30 U.S.C. § 932(a); *E. Associated Coal Corp. v. Director, OWCP*, 805 F.3d 502, 510 (4th Cir. 2015). The LHWCA, in turn, provides us with jurisdiction to review "final order[s]" of the Board. 33 U.S.C. § 921(c). Thus, only the Board's 2017 order was directly appealable to us. The 2013 and 2015 remand orders, by contrast, were interlocutory orders that could not be appealed at the time they were entered. *See Eggers v. Clinchfield Coal Co.*, 11 F.3d 35, 38 (4th Cir. 1993).

Even so, such interlocutory orders do not stay unreviewable forever. Once a final order has been appealed, the entire case—including any prior interlocutory orders by the Board—comes up for review. Two considerations compel that conclusion.

13

First, the APA says as much explicitly: "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. The APA's judicial-review provisions, by their own terms, apply to all agency action unless a statute precludes judicial review. *Id.* § 701(a)(1). Nothing in the LHWCA's judicial-review provision displaces the APA in this respect. *See* 33 U.S.C. § 921(c). To the contrary, the LHWCA confirms that "the court shall have jurisdiction of *the proceeding*"—not merely the final order appealed from. *Id.* (emphasis added).

Second, even without the APA's specific guidance, the LHWCA's grant of jurisdiction to review "final orders" of the Board is properly read to include interlocutory orders once a final order is entered. It is a longstanding principle of law that, where appellate jurisdiction is limited to final orders, this limitation goes to the timing, not the availability, of review. Congress restricted appellate jurisdiction to "final decrees" in the Judiciary Act of 1789, yet that was held to mean the whole case (including interlocutory orders) came up for review once an appeal was taken. *See Forgay v. Conrad*, 47 U.S. (6 How.) 201, 205–06 (1848). That remains true today: while the courts of appeals generally have jurisdiction only over "final decisions" of district courts, 28 U.S.C. § 1291, interlocutory orders are said to "merge" with the final judgment, so that they all can all be reviewed together once the district court proceedings have concluded, *e.g.*, *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 120 (4th Cir. 2015). The statutory grant of appellate jurisdiction to review Board decisions should be read similarly. *Cf. Eggers*,

14

11 F.3d at 38 ("The finality requirement contained in [33 U.S.C.] § 921 encompasses the same concepts as finality in 28 U.S.C. § 1291.").

Several of our sister circuits have agreed, holding that interlocutory Board orders become reviewable once a final order has entered in LHWCA cases. *See Rhine v. Stevedoring Servs. of Am.*, 596 F.3d 1161, 1165–66 (9th Cir. 2010); *Burns v. Director, OWCP*, 41 F.3d 1555, 1561–62 (D.C. Cir. 1994); *Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 943–44 (5th Cir. 1991). And at least one has held the same in a black lung case, which is governed by the LHWCA's judicial-review provision. *See Van Dyke v. Missouri Mining, Inc.*, 78 F.3d 362, 365 (8th Cir. 1996) (holding, in black lung case, that although "our review arises from the [Board's] 1995 order, we are entitled to look at the entire record [*i.e.*, including prior Board orders] in determining whether the [Board] committed errors of law or adhered to its standard of review"). Our own precedent also supports this conclusion. In *See v. WMATA*, 36 F.3d 375 (4th Cir. 1994), we determined that an interlocutory order issued by the Board had erroneously rejected certain findings by an ALJ in a case under the LHWCA; accordingly, we reinstated the improperly rejected findings and remanded for further proceedings. *See id.* at 382–84. We could not have done so if we lacked jurisdiction over the Board's interlocutory orders.

The Sixth Circuit appears to have held to the contrary. In *Bartley v. L&M Coal Co.*, 901 F.2d 1311 (6th Cir. 1990) (per curiam), the Sixth Circuit rejected what it called the "erroneous assumption that we have jurisdiction to review Board action on an ALJ's decision that has since been reversed by the ALJ himself on remand." *Id.* at 1313. Instead, the court held that it had "no authority to review the ALJ's *first* resolution of the

petitioner's claim." *Id.*  It is not entirely clear whether *Bartley*'s holding rested on truly jurisdictional grounds.  *Cf. Bowles v. Russell*, 551 U.S. 205, 215 (2007) (warning that "jurisdiction" is a "word of many, too many, meanings").  To the extent *Bartley* did find a lack of appellate jurisdiction, it is not in accordance with the APA or the LHWCA's judicial-review provision.  Therefore, we have jurisdiction over all three Board orders.

**B.**

Even when we have jurisdiction to review interlocutory orders of the Board, there may be nonjurisdictional reasons to limit our review to the Board's final order.  But none applies here.

Bell suggests one such reason, though it is a bad one.  In appealing Judge Johnson's decision to the Board, the CWP Fund argued that the Board's 2013 and 2015 orders were incorrectly decided and should be reversed.  The Board rejected that argument, concluding that its prior orders were the law of the case.  On appeal, Bell seems to say that law-of-the-case principles should limit our review as well.  Not so.  The law-of-the-case doctrine provides that a court should normally stick to its own prior orders in the same case, as well as the prior orders of a coordinate transferor court, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988), and any mandate it receives from a higher court, *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993).  It has no application when a higher court reviews the orders of a lower tribunal for the first time.  *See, e.g.*, *Hill v. Henderson*, 195 F.3d 671, 677–78 (D.C. Cir. 1999).

There would be a more plausible argument for withholding review if Judge Krantz's decisions had resolved the merits of the case at a preliminary stage, one

16

analogous to a motion to dismiss or for summary judgment. Consider a scenario where an ALJ dismisses the claimant's case at the agency equivalent of summary judgment; the agency review board revives the claim; the ALJ finds for the claimant after a hearing; and the board affirms. In such a case, the focus of our review should arguably be on the evidence adduced at the hearing, not the evidence at summary judgment. That argument finds support by analogy to our procedures in civil cases. We generally do not review a district court's denial of summary judgment on issues that were ultimately decided at trial. *Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1234–37 (4th Cir. 1995). Some of our sister circuits have similarly concluded that they should not generally review a district court's denial of a motion to dismiss after a trial on the merits. *See ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1172 (10th Cir. 2011); *Bennett v. Pippin*, 74 F.3d 578, 585 (5th Cir. 1996). The theory is that any factual deficiencies in the pleadings or in the evidence introduced at summary judgment should not overturn a meritorious claim supported by sufficient evidence at trial. *See* 15A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3905.1, at 258 (2d ed. 1991).

But the analogy breaks down when applied to the procedural posture of this case. Judge Krantz did not reach his decisions based on a preliminary review of the merits; rather, both he and Judge Johnson reached their decisions after a hearing. This case is more like one in which a district court held a trial, granted a motion for a new trial, and then held a second trial. In such a case, if the district court abused its discretion in ordering the new trial, the remedy is to vacate the second verdict and reinstate the first.

17

*See Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 56 (2d Cir. 2015); *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1143 (9th Cir. 1999); *Brun-Jacobo v. Pan Am. World Airways, Inc.*, 847 F.2d 242, 247 (5th Cir. 1988); *Fondren v. Allstate Ins. Co.*, 790 F.2d 1533, 1536 (11th Cir. 1986); *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 11 (1st Cir. 1982); *Gaedeke Holdings VII LTD v. Baker*, 683 F. App'x 677, 682 (10th Cir. 2017); 11 WRIGHT & MILLER, *supra*, § 2818 & n.6, at 244 (3d ed. 2008). Applying the same principle makes eminent sense here. Judge Krantz's decisions would have resolved the case but for the Board's orders vacating them. Thus, if the Board erred and Judge Krantz's decisions were in fact sound, his decision to deny benefits should be reinstated.

Moreover, shielding the Board's prior orders from review in cases like this one would have disturbing implications. If we could not reinstate an ALJ's prior award, the Board would have *carte blanche* to interfere with ALJs' fact-finding authority despite the statutory limits on its powers. The Board could simply continue to vacate and remand until the ALJ finally took the hint and reached the decision the Board wanted—without the possibility of judicial intervention. Permitting that result would be inconsistent with our duty "to ensure the [Board's] decision adhered to its statutory standard of review." *Westmoreland Coal Co. v. Sharpe ex rel. Sharpe*, 692 F.3d 317, 327 (4th Cir. 2012) (quoting *Dehue Coal Co. v. Ballard*, 65 F.3d 1189, 1193 (4th Cir. 1995)).

Any limitation on our review in a case like this one stems instead from the harmless-error doctrine. Even where the Board has erroneously vacated an ALJ's decision, that error could perhaps be considered harmless if the ALJ would have reached the same decision regardless of the Board's error. Judge Ripple of the Seventh Circuit

18

has argued for that result in a case in which the Board vacated an ALJ's order on a narrow technical ground and the ALJ then reversed his own decision after a complete reconsideration of the facts. Under those circumstances, Judge Ripple reasoned, the Board's order was harmless because the ALJ reconsidered the case for reasons independent of those the Board gave for remanding. *Crowe ex rel. Crowe v. Zeigler Coal Co.*, 646 F.3d 435, 460–61 (7th Cir. 2011) (Ripple, J., dissenting).[4]

Bell and the Director have made no harmless-error argument. *Cf. United States v. Ghane*, 673 F.3d 771, 787 (8th Cir. 2012) (in a criminal case, "when harmless error is not raised in an appellate brief, the argument is waived unless the court exercises discretion to overlook the waiver"). But even if the issue were before us, and assuming (without deciding) that Judge Ripple's theory of harmless error is a viable one, I would conclude that any errors in the Board's 2013 and 2015 orders were not harmless. Judge Johnson largely adopted the reasoning suggested by the Board's prior orders in reaching his conclusion. Put differently, the Board provided a roadmap for reinterpreting the facts, and Judge Johnson followed it. If the Board erred, then its errors cannot have been harmless.

Accordingly, I must review the Board's 2013 and 2015 orders. If they improperly rejected Judge Krantz's decisions denying benefits, then this court may reinstate Judge Krantz's decisions. *See See*, 36 F.3d at 382–84. If, however, the Board properly rejected

---

[4] It may be that this reasoning, and not any truly jurisdictional concern, explains the Sixth Circuit's decision in *Bartley*, discussed above.

Judge Krantz's decisions, I must then proceed to evaluate the Board's order affirming Judge Johnson's decision.

## III.

The next issue is just how much of the case the Respondents have forfeited. The CWP Fund spent most of its opening brief arguing that the Board erred in 2013 and 2015 when it vacated Judge Krantz's decisions denying benefits. The Respondents largely failed to respond to these arguments. On the part of the Director, this represented an intentional decision: she expressly chose to limit her brief to arguments supporting the Board's 2017 order affirming Judge Johnson's decision. Brief of the Federal Respondent at 3 n.2. Bell addressed the 2013 and 2015 orders only to argue that the Board, in its 2017 order, correctly applied the law-of-the-case doctrine. Response Brief of Respondent Donald R. Bell, Sr., at 15–16.

In its reply, the CWP Fund suggests—not unreasonably—that this failure to substantively respond to its arguments attacking the Board's 2013 and 2015 orders amounts to a concession. For my part, I am troubled by the Respondents' failure to engage fully in the adversarial process, which does not well serve the litigants, the court, or the judicial process. I must therefore determine whether the Director and Bell have forfeited their response to the CWP Fund's arguments (apart from any jurisdictional objection to our reviewing the 2013 and 2015 orders, which cannot be forfeited).[5] By

---

[5] An argument that the other side has "conceded" a point of fact or law by failing to address it is just another way of invoking forfeiture: the claim is that we should accept the point as true because the other side has forfeited its response.

"forfeiture" I mean the loss of a right by failure to assert it in a timely fashion, as opposed to "waiver" in the technical sense of the voluntary relinquishment of a known right. *See generally United States v. Olano*, 507 U.S. 725, 733 (1993) (discussing the distinction between "waiver" and "forfeiture").[6]

The courts of appeals have differed on whether an appellee[7] can be charged with forfeiture when he fails to respond to the appellant's arguments. The Sixth Circuit has suggested there is no support for that proposition. *See Leary v. Daeschner*, 228 F.3d 729, 741 n.7 (6th Cir. 2000). The Third Circuit has similarly noted that "an appellee does not concede that a judgment should be reversed by failing to respond to an appellant's argument in favor of reversal." *Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005). But in the same opinion, the Third Circuit acknowledged that, in practice, an appellee forfeits all responses to the appellant's argument that are not "obvious." *Id.* (citing *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994)). The Seventh Circuit has gone further and concluded that an appellee, by failing to respond to an argument in the appellant's brief that is not frivolous or nondispositive, "acquiesces" to the argument so that the appellee's response is deemed to be waived. *Cincinnati Ins. Co. v. E. Atl. Ins.*

---

[6] The Director's express limitation of her argument looks more like a waiver than a forfeiture, but that does not matter here because Bell cannot be said to have "waived" his arguments in the strict sense of the word.

[7] In this agency-review case, we have a "Petitioner" and a "Respondent," not an "Appellant" and "Appellee." But I see no principled distinction, for waiver and forfeiture purposes, between an appellee's obligation to defend a favorable district-court judgment and a respondent's obligation to defend a favorable agency decision.

*Co.*, 260 F.3d 742, 747 (7th Cir. 2001). And our court has suggested that an appellee who simply ignores arguments in the appellant's brief has forfeited his response, because "an outright failure to join in the adversarial process would ordinarily result in waiver." *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016).

In my view, our opinion in *Alvarez* got things right: an appellee's wholesale failure to respond to a conspicuous, nonfrivolous argument in the appellant's brief ordinarily constitutes a forfeiture. There are several reasons for such a rule. The first is basic fairness. Appellants have an obligation to clearly present their arguments for appeal in their opening brief, on penalty of forfeiture. When the appellant has done that, we reasonably can and should expect the appellee to respond in kind. Next, this rule helps instill respect for the adversarial process. Appellees must know that they risk forfeiture if they fail to respond to the appellants' properly-presented arguments. If we always undertook a complete review of the appellant's argument when the appellee had declined to respond, we would dull appellees' incentives to participate in the process. Modesty about our own abilities also counsels against reaching issues that the appellee has failed to brief: our capacity to err is higher when deciding issues without the benefit of argument from both sides. Finally, an appellee's failure to address an issue conspicuously presented in the appellant's brief might well reflect a conscious choice, and we should not lightly wade into issues a party has voluntarily chosen to concede. (The result would be different, of course, if the appellant had filed a scattershot brief riddled with underdeveloped arguments; there, I would not penalize the appellee for properly focusing on the issues that it perceives to matter.)

22

Still, courts of appeals sometimes do overlook a party's forfeiture, because "we possess the discretion under appropriate circumstances to disregard the parties' inattention to a particular argument or issue." *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013). Indeed, we have done so even when *both* parties have failed to address an issue. *See id.* Several factors guide our decision whether to overlook forfeiture. For example, our interest in doing substantive justice weighs against accepting a meritless argument simply because the other side has failed to respond. *Cf. A Helping Hand, LLC v. Baltimore Cty.*, 515 F.3d 356, 369 (4th Cir. 2008) (explaining that an appellant's forfeiture may be excused to avoid a "miscarriage of justice"). Also, considerations of judicial economy often support addressing an issue of law, even one not fully briefed by the parties, where there is an adequate record for review. *Holness*, 706 F.3d at 592.

Two considerations should make us more willing to excuse an appellee's forfeiture than an appellant's. First, respect for the district courts (and, in cases like this one, for federal agencies) should make us reluctant to overturn their judgments without due consideration. Second, as a practical matter, the record usually presents us with arguments for affirmance in the form of a reasoned opinion by the lower tribunal, no matter what the appellee says (and fails to say) in its brief.

Here, the Director's and Bell's failure to respond to the CWP Fund's arguments represents the sort of "outright failure to join in the adversarial process [that] would ordinarily result in [forfeiture]." *Alvarez*, 828 F.3d at 295. The Director chose not to respond at all to the arguments directed against the Board's 2013 and 2015 orders. And

while Bell made his argument about the law-of-the-case doctrine, that was not a meaningful response to the CWP Fund's arguments, but simply an argument for not reviewing the 2013 and 2015 orders (and a meritless one, at that).

Nonetheless, I would exercise this court's discretion to overlook this forfeiture to a limited extent. First, if the Board were correct that Judge Krantz erred, then it would work injustice to overturn Judge Johnson's decision awarding benefits to Bell. Moreover, and just as importantly, Bell may have erroneously believed that our jurisdiction was limited to the Board's final order; while I do not believe that this jurisdictional issue was difficult, it was not neatly addressed in binding precedent. Finally, despite the Respondents' forfeiture, we do have reasoned arguments against the CWP Fund's position: the Board's 2013 and 2015 orders explain how, in the Board's view, Judge Krantz erred. Therefore, I will consider the arguments the Board itself gave to support its decisions. I will not, however, look beyond the Board's orders to identify other potential errors that Judge Krantz may have made.

**IV.**

At last, I turn to the merits. In its 2013 and 2015 orders, the Board concluded that Judge Krantz's written opinions failed to comply with the APA because they inadequately explained his decisions. We of course owe no deference to the Board's interpretation of the APA, both because it is not a policymaking body, *see Clinchfield Coal Co. v. Harris*, 149 F.3d 307, 309 (4th Cir. 1998), and because the APA is a statute whose interpretation is committed to the judiciary, not to agencies, *see Prof'l Reactor Operator Soc'y v. U.S. Nuclear Regulatory Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir.

1991).  Rather, whether an ALJ has complied with the APA is an issue of law we review de novo.

In this case it was the Board, not Judge Krantz, that erred.  Judge Krantz's decisions thoroughly examined the conflicting evidence and reached a reasonable conclusion.  While he perhaps could have said more about certain issues, his omissions were not so significant as to render his opinions unreasonable.  Therefore, Judge Krantz's decisions should have been affirmed.

**A.**

By statute, the Board must affirm an ALJ's factual findings "if supported by substantial evidence in the record considered as a whole."  33 U.S.C. § 921(b)(3).  The "substantial evidence" standard is essentially the same as the "arbitrary-or-capricious" standard that generally governs agency review; it is merely a specific articulation of arbitrary-or-capricious review as applied to agency findings of fact.  *See Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016); *James City Cty. v. EPA*, 12 F.3d 1330, 1337–38 n.4 (4th Cir. 1993).  When the Board has reversed the ALJ, our role is to ensure that the Board correctly applied the substantial-evidence standard to the ALJ's ruling. *Westmoreland Coal Co. v. Sharpe ex rel. Sharpe*, 692 F.3d 317, 327 (4th Cir. 2012).  I will therefore begin by summarizing what this standard requires.

When reviewing agency decisions for substantial evidence, courts typically find two types of errors.  First, the evidence may be so one-sided that it cannot support the agency's decision.  Such errors occur when the record lacks "such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion." *Consol.*

25

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Overturning an agency's decision on this ground resembles finding, in a civil action, that there was insufficient evidence to warrant putting the case before a jury.  *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

Given the deferential nature of substantial-evidence review, the first type of error is not too common.  This case is no exception.  No party has suggested that Judge Krantz's orders contained errors of this kind.  And the record simply cannot support an argument that the facts were so one-sided in favor of Bell that they required granting his request for benefits.  I note that, while the evidence conflicted, Bell's case was not especially strong, particularly given his extensive smoking history.

This case instead concerns the second type of error, which occurs when the agency fails to adequately explain its reasoning.  Here, the standards for reviewing jury verdicts and agency decisionmaking diverge sharply.  A jury, of course, need not explain its reasoning, and we will uphold a jury verdict so long as there is *some* basis in the record to conclude that the jury *could* have reasonably reached its conclusion.  By contrast, the record in an agency-review case must show that the agency *actually did* follow a reasonable path in reaching its decision.  *See* 5 U.S.C. § 557(c)(A) (requiring, in decisions after formal proceedings, "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record"); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (to satisfy general arbitrary-and-capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational

26

connection between the facts found and the choice made" (internal quotation marks omitted)). Thus, an agency decision that rests on faulty reasoning must usually be vacated, even if there are good reasons that could support the same outcome. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943).

If an agency affirmatively gives an irrational explanation for its decision, our analysis is straightforward: unless the error was harmless, we must vacate the decision. The harder cases involve agency silence. At what point does an agency become so tight-lipped that we cannot tell whether it followed a rational path to its decision? Answering this question requires a careful balancing. On the one hand, we must hold the agency's feet to the fire, ensuring that it has taken a hard look at the record before it. In formal adjudications, agency decisionmakers must address "the material issues of fact, law, or discretion presented." 5 U.S.C. § 557(c)(A). And in all cases, we must vacate an agency's decision if it has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Nor may we supply a reasoned explanation that the agency failed to give. *Id.* On the other hand, we have repeatedly emphasized that the APA "is not intended to be a mandate for administrative verbosity." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016) (quoting *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999)). So long as we can "fairly discern" the path the agency took to its decision, we may not require the agency to say more. *Id.* To find the balancing point, we must remember that silence is fatal only when the agency *entirely* fails to consider an *important* (*i.e.*, material) aspect of the problem. The words "entirely" and "important" are key. We do not require an agency to address every aspect

of every issue, no matter how insubstantial.  Nor do we require detailed explanations.  We require only *some* explanation of the *important* issues.  *See, e.g.*, *Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1409 (4th Cir. 1995) (affirming decision that did not discuss irrelevant issues and "provided a reasoned discussion of the legal arguments the [agency] considered material," because an agency's "failure to address every argument in detail does not render its decision arbitrary").

In black lung cases, our court has struck this balance in a particular way.  "ALJs have a duty to analyze 'all of the relevant evidence' and to provide a sufficient explanation for their 'rationale in crediting certain evidence.'"  *Bill Branch Coal Corp. v. Sparks*, 213 F.3d 186, 190 (4th Cir. 2000) (quoting *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998)).  "Thus, '[e]ven if legitimate reasons exist for rejecting [or crediting] certain evidence, the [ALJ] cannot do so for no reason or for the wrong reason.'"  *Sea "B" Mining*, 831 F.3d at 252–53 (alterations in original) (quoting *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980)).

But ALJs need not discuss the evidence at an exhaustive level of detail.  There is no requirement that ALJs discuss every passage in every deposition transcript, every sentence in every expert report, or every page of every medical form.  Nor are ALJs required to consider every possible reason for crediting or discrediting any particular piece of evidence.  "For our purposes, it is enough that the ALJ considered all relevant evidence and explained his rationale in resolving any conflict in the testimony."  *West Virginia CWP Fund v. Director, OWCP*, 880 F.3d 691, 698 (4th Cir. 2018).  Once we have assured ourselves that the ALJ considered the relevant evidence and gave a logical

28

explanation for deciding the important issues before him, our work is done. So too is the work of the Board, which applies the same substantial-evidence test we do when reviewing an ALJ's decision. *Kerns v. Consolidation Coal Co.*, 176 F.3d 802, 804 (4th Cir. 1999).

Finally, even when an ALJ has erred, the power to reverse his decision is limited by the harmless-error doctrine. This limitation is codified in the text of the APA, which commands that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *see Shinseki v. Sanders*, 556 U.S. 396, 406–07 (2009). Thus, "[r]eversal on account of error is not automatic but requires a showing of prejudice." *Sea "B" Mining*, 831 F.3d at 253. The harmless-error doctrine prevents courts from becoming "impregnable citadels of technicality." *Id.* at 253 (quoting *Sanders*, 556 U.S. at 407). It requires us to consider "'the likelihood that the result would have been different,' as well as how the error might impact the public perception of such proceedings." *Id.* at 253–54 (quoting *Sanders*, 556 U.S. at 411). And when the Board reviews an ALJ's decision for consistency with the APA, it must apply the same harmless-error principles we do: the ALJ's findings are binding on the Board if supported by substantial evidence "in the record considered as a whole," 33 U.S.C. § 921(b)(3), and so the Board has no authority to overturn those findings because of a harmless error. Thus, whether an error in the ALJ's decision is harmless is an issue of law we review de novo. *See, e.g., Eagle v.*

*Armco, Inc.*, 943 F.2d 509, 512 n.3 (4th Cir. 1991) (rejecting Board's finding of harmless error).[8]

**B.**

I now apply these principles to the Board's prior orders, starting with the 2013 order that partially vacated Judge Krantz's first decision.

The Board's 2013 order found only one supposed error in Judge Krantz's decision, which concerned Dr. Shipley's x-ray interpretation. In his "B-Reading" form, Dr. Shipley noted abnormalities in the x-ray and stated: "probably not [coal workers' pneumoconiosis]—consider CT [scan] to r/o [rule out] malignancy." J.A. 16. In his accompanying report, he further explained: "Ill-defined lobulated noncalcified nodular lesions are present over each mid zone laterally. Because of the absence of background small rounded opacities, these are unlikely to represent large opacities of pneumoconiosis. Comparison with any prior or subsequent radiographs should be considered to rule out malignancy." J.A. 15. The Board reasoned that, under this Court's

---

[8] In some situations, Congress has committed the harmless-error analysis to a particular tribunal. For example, in *Sanders*, the Supreme Court considered the statutory scheme for veterans' disability benefits, where administrative decisions are reviewed in the Court of Appeals for Veterans Claims (an Article I tribunal) and then in the Federal Circuit. 556 U.S. at 400. The Federal Circuit's review is limited to certain types of errors concerning the validity and interpretation of statutes and regulations. *Id.* at 411. The Court therefore determined that the Article I court—not the Federal Circuit—was the right body to undertake the harmless-error analysis. *Id.* In the black lung context, by contrast, there is no statutory commitment to the Board of whether errors under the APA are harmless. Moreover, the statute does not limit our authority in black lung cases to reviewing certain types of errors, but does affirmatively limit the Board's authority by requiring deference to the ALJ.

holding in *Westmoreland Coal Co. v. Cox*, 602 F.3d 276 (4th Cir. 2010), Judge Krantz could have rejected Dr. Shipley's reading as speculative given his qualifying language ("probably not" and "unlikely"). J.A. 178–79. Because Judge Krantz had not addressed the issue, the Board concluded, he had not adequately explained his reasoning. *Id.*

The Board misapplied both *Cox* and the APA in reaching this result. In *Cox*, the record included several expert interpretations of multiple chest x-rays. 602 F.3d at 285. Cox would be entitled to the irrebuttable presumption of total disability due to pneumoconiosis if the x-ray showed "one or more large opacities (greater than one centimeter in diameter)" characteristic of pneumoconiosis. 30 U.S.C. § 921(c)(3)(A). All the experts agreed that Cox's x-rays showed multiple opacities over one centimeter in diameter, and at least one opacity over three centimeters in diameter. The experts disagreed, however, on whether the opacities were characteristic of pneumoconiosis; Cox's expert's thought they were, while the employer's experts attributed the opacities to other diseases (such as tuberculosis). 602 F.3d at 286. Yet the record contained no evidence that Cox had ever been diagnosed with any of those other diseases. *Id.* Given those facts, we concluded, the ALJ could permissibly discount the opinions of the employer's experts as speculative. *Id.* at 287.

The Board's treatment of *Cox* erred in three respects. First, the Board failed to appreciate the procedural posture of *Cox*. In *Cox*, we upheld the ALJ's decision, finding she had discretion to reject the experts' alternative diagnoses as speculative where those diagnoses lacked other support in the record. We did not hold that the ALJ in that case

31

was *required* to reject such expert opinions as speculative. Nor did we hold that the ALJ was required to address the issue.

Second, the Board misread *Cox* as resting on qualifying language used by employer's experts, who said the opacities at issue were "likely" due to diseases other than pneumoconiosis. As we have explained, however, qualifying language tends if anything to bolster an expert's opinion: "refusal to express a diagnosis in categorical terms is candor, not equivocation," and "enhances rather than undermines [an expert's] credibility." *Perry v. Mynu Coals, Inc.*, 469 F.3d 360, 366 (4th Cir. 2006). *Cox* did not rest on equivocation by the employer's experts, but on the fact that they could not point to any evidence, apart from the x-rays themselves, to support their alternative diagnoses.

Third, the Board failed to appreciate that this case, unlike *Cox*, does not lack record support for alternative diagnoses. Bell's own expert, Dr. Forehand, reported that Bell had suffered three prior bouts of pneumonia. J.A. 6. Bell also told Dr. Ghio that he had been treated for pneumonia 14 times. J.A. 61. And Dr. Castle connected Bell's history of pneumonia to the x-ray, opining that the mid-lung abnormalities at issue were "a result of scarring from previous infections." J.A. 91. There was also, of course, Bell's long history of heavy smoking. As a result, the "speculativeness" issue in this case is nowhere near as substantial as it was in *Cox*.

The Board may be right that Judge Krantz *could* have chosen to discount Dr. Shipley's interpretation as speculative, because there is no indication that Dr. Shipley himself was aware of Bell's prior medical history or even made an alternative diagnosis. Yet I cannot agree with the Board that this issue was so substantial that Judge Krantz, by

32

failing to address it, entirely ignored an important aspect of the problem. Judge Krantz knew that there was a dispute between the experts over how to characterize mid-lung abnormalities on Bell's x-ray, and he quoted at length Dr. Castle's testimony explaining that these abnormalities likely resulted from infection. J.A. 148. In the face of the conflicting expert testimony, he chose to credit the interpretation of Dr. Shipley, who as a board-certified radiologist had the most relevant credentials of all three experts. J.A. 159. It is perfectly reasonable to resolve a battle of the experts by reference to their credentials. Indeed, ALJs are generally required to consider experts' credentials. *See* 20 C.F.R. § 718.202(a)(1); *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 536 (4th Cir. 1998). That Judge Krantz failed to address a potential, but rather weak, basis for reaching a different conclusion does not make his reasoning arbitrary, capricious, or unsupported by substantial evidence.

In short, Judge Krantz's opinion shows that he understood the issues surrounding the x-ray interpretations and gave a rational explanation for accepting Dr. Shipley's interpretation over the other experts'. Because that is all the APA requires, the Board erred in concluding that Judge Krantz did not adequately explain his decision to credit Dr. Shipley.

## C.

Next I will review the Board's 2015 order.[9]  In the 2015 order, the Board found that Judge Krantz failed to justify his decisions to credit (1) Dr. Shipley's x-ray interpretation, (2) Dr. Castle's medical opinion, and (3) Dr. Ghio's medical opinion. Addressing each in turn, I disagree with the Board's decision to vacate Judge Krantz's decision a second time.

## 1.

In its 2015 order, the Board again faulted Judge Krantz's handling of Dr. Shipley's x-ray interpretation.  Judge Krantz had concluded, quite reasonably, that Dr. Shipley's interpretation was not speculative and that his qualifying language merely expressed the uncertainties inherent in most medical diagnoses.  Judge Krantz also distinguished *Cox* on the ground that all the experts in *Cox* agreed that large opacities existed, while both Dr. Castle and Dr. Shipley had concluded that there were no large opacities on the x-ray. J.A. 189.  The Board questioned the latter aspect of Judge Krantz's reasoning, concluding that he should have considered other evidence in the record in determining whether Dr. Shipley's opinion that the x-ray showed no large opacities was credible.  J.A. 199–200.

Whatever quibbles one might have with Judge Krantz's reasoning in distinguishing *Cox*, they cannot support the Board's decision to vacate his second

---

[9] One might argue I already have provided sufficient grounds to reverse because the Board's 2013 order erred in reversing Judge Krantz's decision to deny benefits. However, that error would be harmless if the Board's 2015 order correctly identified other errors that warranted vacating Judge Krantz's decision.

decision.  Judge Krantz did not need to distinguish this case from *Cox*; indeed, his entire discussion of *Cox* was prompted by the Board's misreading of that case in its 2013 order.

Moreover, I find the Board's 2015 order somewhat baffling insofar as it found that Judge Krantz failed to consider relevant evidence of masses in Bell's lungs.  The Board faulted Judge Krantz for failing to discuss Dr. Castle's testimony about ambiguous densities on the 2010 x-ray, J.A. 199–200, but Judge Krantz had quoted that very passage at full in his 2013 decision, J.A. 148.  This raises the disturbing possibility that the Board simply ignored Judge Krantz's first decision, an irrational course of conduct given that the earlier decision was vacated only in part and then expressly "reaffirmed" by Judge Krantz in his second decision.[10]  When Judge Krantz's decisions are read as a whole, it is clear he understood that there was *something* on the 2010 x-ray that could be interpreted as a large opacity characteristic of pneumoconiosis.  He simply found that Dr. Shipley's

---

[10] The Board also faulted Judge Krantz for failing to consider a 2011 CT scan. J.A. 200.  But there is an obvious reason why Judge Krantz did not expressly address the CT scan:  the parties chose to rely only on the 2010 x-ray in litigating whether Bell had complicated and clinical pneumoconiosis.  J.A. 159, 188, 190.  Moreover, the record before us does not contain any expert interpretation of the CT scan as positive for pneumoconiosis or as containing opacities "classified in category A, B, or C" under the relevant International Labor Organization standards.  30 U.S.C. § 921(c)(3).  All we have are treatment records that do not appear to evaluate the CT scan for pneumoconiosis at all, much less apply the relevant statutory standard.  Judge Krantz acknowledged the existence of these treatment records but did not discuss them in analyzing the irrebuttable presumption.  I cannot agree with the BRB or my dissenting colleague that Judge Krantz was obligated, in weighing conflicting expert interpretations of the 2010 chest x-ray, to expressly discuss treatment records summarizing the results of a later CT scan that the parties themselves had not relied on to litigate the statutory presumption.

negative interpretation was the most credible. The Board should have upheld that finding.[11]

## 2.

Next, the Board concluded that Judge Krantz had failed to justify his decision to credit Dr. Castle's opinion. Dr. Castle had opined as follows: "When coal workers' pneumoconiosis causes impairment, it *generally* does so by causing a mixed, irreversible obstructive and restrictive ventilatory defect. There was no evidence of any restriction in this case." J.A. 24 (emphasis added). The Board thought that this reasoning might be "contrary to the regulatory definition of legal pneumoconiosis." J.A. 203. It faulted Judge Krantz for failing to consider the issue.

To understand the Board's reasoning, some background is required. By statute, the "term 'pneumoconiosis' means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b). There are two types of lung impairments: "restrictive" impairments, which are "characterized by a reduction in lung volume," and "obstructive" impairments, which "result from limitation in expiratory airflow." *Gulf & Western Indus. v. Ling*, 176 F.3d 226, 229 n.6 (4th Cir. 1999).

---

[11] My dissenting colleague argues not merely that Judge Krantz failed to adequately explain his reliance on Dr. Shipley's interpretation, but that Dr. Shipley's interpretation had to be rejected as inconsistent with Department of Labor standards. While I am skeptical this argument has merit, I will not pass on it because no one involved in the case—not Bell, the Director, the BRB, or either ALJ—has ever made or even hinted at this argument.

36

We have long held that purely obstructive impairments can fall within the legal definition of pneumoconiosis. *Stiltner v. Island Creek Coal Co.*, 86 F.3d 337, 341 (4th Cir. 1996). As a result, we have "cautioned ALJs not to rely on medical opinions that rule out coal mine employment as a causal factor based on the erroneous assumption that pneumoconiosis causes a purely restrictive form of impairment, thereby eliminating the possibility that coal-dust exposure also can cause COPD [*i.e.*, chronic obstructive pulmonary disease]." *Id.* In a 2000 regulation, the Department of Labor reinforced this view. The preamble to the regulation found that "the prevailing view of the medical community and the substantial weight of the medical and scientific literature supports the conclusion that exposure to coal mine dust may cause chronic obstructive pulmonary disease." Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79,920, 79,923 (Dec. 20, 2000). The regulation itself made clear that legal pneumoconiosis includes "any chronic restrictive *or* obstructive pulmonary disease." 20 C.F.R. § 718.201(a)(2) (emphasis added). In short, an expert opinion cannot be credited when it rests on the assumption that purely obstructive lung disease can *never* be legal pneumoconiosis.

Yet it is a different story when a medical expert says that a miner "*likely* would have exhibited a restrictive impairment in addition to COPD, if coal dust exposure were a factor." *Stiltner*, 86 F.3d at 341. We have afforded ALJs considerable discretion in deciding whether to credit such expert testimony. On the one hand, we have held that an ALJ may credit the testimony if it is "based on a thorough review of all of the medical evidence, rather than an assumption that contravenes the Act and regulations." *Id.* at 342.

37

On the other hand, we have permitted ALJs to reject expert testimony if they find it to be in tension with the preamble to the 2000 rulemaking. *See, e.g.*, *Westmoreland Coal Co. v. Stallard*, 876 F.3d 663, 667 (4th Cir. 2017); *Dante Coal Co. v. Director, OWCP*, 164 F. App'x 338, 347 (4th Cir. 2006) (upholding ALJ decision that rejected similar testimony by Dr. Castle).

The Director suggests in her brief that *Stiltner* may no longer be good law in light of the 2000 preamble. No matter what the preamble says, we remain bound by *Stiltner*. The preamble is not a binding regulation with the force of law, but merely a summary of the agency's view of the medical literature. *See Harman Mining Co. v. Director, OWCP*, 678 F.3d 305, 315–16 (4th Cir. 2012). And even if we could overturn *Stiltner*, I would not. There is a fair argument that expert opinions like Dr. Castle's—those stating that purely obstructive lung disease is not "likely" or "generally" caused by coal-dust exposure—should be given less weight because they are in tension with the legal definition of pneumoconiosis. But "in tension with" is not the same as "contrary to." Although the regulatory definition of pneumoconiosis includes purely obstructive diseases, that does not foreclose an expert from opining that purely obstructive diseases are not likely to have arisen from coal-dust exposure, particularly when the expert provides multiple other considerations to support his conclusion (as Dr. Castle did here). Such opinions cannot be rejected as a matter of law. As *Stiltner* held, it remains within the province of the factfinder—the ALJ—to decide whether this issue undermines an expert's credibility.

Under *Stiltner*, Judge Krantz had the discretion to credit Dr. Castle's testimony. The Board did not disagree; it merely held that Judge Krantz erred in failing to address the issue. One might question the premise that ALJs are required to address this issue in every case where it arises. Regardless, Judge Krantz *did* address the issue: his 2013 decision, citing *Stiltner*, declined to "discredit Dr. Castle's opinion merely because he suggested that he generally expects to see both obstructive and restrictive defects." J.A. 169. The only explanation for the Board's conclusion is that it overlooked this passage in Judge Krantz's 2013 decision. As I have already noted, that was improper. It is hardly surprising that Judge Krantz did not address the issue again in 2015, given that the point of his second opinion was simply to address concerns about the potential "speculativeness" of Dr. Shipley's x-ray interpretation. The Board thus erred in ignoring Judge Krantz's reasoning on this issue.

My dissenting colleague offers an alternative ground for affirming the Board's ruling. Unlike the Board, my colleague acknowledges that Judge Krantz did, in fact, address this issue. However, my colleague argues that Judge Krantz's treatment of this issue was too cursory. Even if it were not forfeited, this argument would fail on its merits. Dr. Castle gave multiple reasons—independent of his views about purely obstructive lung disease—for concluding that Bell did not have pneumoconiosis. And Judge Krantz took these other reasons into account. For example, in the very passage my colleague quotes, Judge Krantz noted Dr. Castle's view that coal workers' pneumoconiosis is typically "irreversible," J.A. 168—a principle that our case law endorses, *see, e.g.*, *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 133 (4th Cir.

39

2014). This undermined Bell's claim, because his lung function fluctuated over time. Immediately before that passage, Judge Krantz provided over two pages summarizing Dr. Castle's other reasoning. *See* J.A. 166–68. Reading Judge Krantz's decision as whole, one can fairly discern that he thought this one issue did not cast doubt on Dr. Castle's "thorough review of all the medical evidence." *Stiltner*, 86 F.3d at 342. Neither our precedent nor basic APA principles required further explanation for the decision to credit Dr. Castle's opinion, which was entirely consistent with our holding in *Stiltner*.

**3.**

Finally, the Board found that Judge Krantz had erred in deciding to credit the opinion of Dr. Ghio. Even if there is merit to the Board's analysis, any error regarding Dr. Ghio's testimony, standing alone, was harmless.[12]

Judge Krantz relied in part on Dr. Ghio's opinion in finding that the CWP Fund had overcome the rebuttable presumption that Bell had legal pneumoconiosis. Judge Krantz found Dr. Ghio's testimony "somewhat troubling" because it erroneously stated that Bell had never received a physician's diagnosis of lung disease associated with coal-dust exposure (recall that Bell's treating physician diagnosed him with black lung disease

---

[12] I note that the CWP Fund failed to adequately address Dr. Ghio's testimony in its briefs. But I can hardly fault the CWP Fund too much given the state of the Respondents' briefs. I also note that the Board did not have occasion to consider whether any error concerning Dr. Ghio's opinion was harmless on its own, because it was not harmless when combined with the purported error the Board identified—mistakenly—in connection with Dr. Castle's opinion. Nonetheless, because we review harmless error de novo, there is no need to remand to the Board to consider it in the first instance.

40

in 2008).  J.A. 192.  Therefore, Judge Krantz gave Dr. Ghio's opinion "somewhat less weight" than Dr. Castle's on the issue of legal pneumoconiosis.  *Id.*

As the Board correctly observed, Judge Krantz failed to address another inconsistency between his own findings and Dr. Ghio's.[13]  Judge Krantz found that Bell was suffering from a totally disabling respiratory condition.  Dr. Ghio found that Bell had *no* respiratory impairment, and that any impairment was due to heart disease.  J.A. 64, 120, 163.  This inconsistency could have affected Dr. Ghio's view of whether Bell had legal pneumoconiosis, which means any "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments."  30 U.S.C. § 902(b).

The Board may be right that Judge Krantz should have explained why, despite this inconsistency, Dr. Ghio's opinion on legal pneumoconiosis remained persuasive.  I need not resolve that issue, because it is plain to me that any error Judge Krantz made in evaluating Dr. Ghio's testimony was harmless.  Judge Krantz chose to credit in full Dr. Castle's opinion that Bell did not have legal pneumoconiosis, and gave little weight to the contrary opinion of Dr. Forehand, whose x-ray interpretation Judge Krantz had rejected.  J.A. 191–92.  These credibility judgments made it a bygone conclusion that Bell did not have legal pneumoconiosis, one that was inevitable even if Judge Krantz had given Dr. Ghio's testimony little or no weight.  Indeed, in Judge Krantz's view, Dr. Ghio's analysis

---

[13] The Board also noted that Dr. Ghio had relied on x-ray interpretations that were not in the record, which under Board precedent permits an ALJ to give less weight to an expert's opinion.  J.A. 203 n.11.  But it appears Dr. Ghio relied on these x-ray interpretations only in offering an opinion on *clinical* pneumoconiosis.  J.A. 119–20. Judge Krantz did not rely on Dr. Ghio's opinion on that issue.

was largely cumulative with Dr. Castle's. *See* J.A. 171 ("Dr. Ghio's report mirrored Dr. Castle's findings."). As a result, this issue by itself could not have justified the Board in vacating Judge Krantz's decisions.

**D.**

In sum, the Board's 2013 and 2015 orders vacating Judge Krantz's decisions were flawed. As a result, I need not address Judge Johnson's decision, and nothing in my analysis casts doubt on the reasonableness of Judge Johnson's findings. This may well be one of those cases in which different factfinders could weigh the same evidence differently. The point is that the case should never have been remanded to Judge Johnson because the Board erred in vacating Judge Krantz's findings.

**V.**

Finally, I come to the issue of remedy. When an agency has erred but could plausibly reach the same conclusion on remand, the correct result is usually to permit the agency to reconsider the issue. That holds true, except in rare circumstances, whenever the agency has simply failed to consider all relevant factors or provided an inadequate record for review. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). But when the record permits only one resolution of the issue at hand, a remand would be futile, and so the correct remedy is outright reversal. *See, e.g.*, *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987).

Under ordinary circumstances, there might be an argument for vacating the Board's orders and remanding for another review of Judge Krantz's decisions. Maybe Judge Krantz's decisions contained other potential errors that the Board did not have a

chance to analyze. But remand would be fruitless in this case in light of the Respondents' forfeiture. In my view, as explained above, that forfeiture encompasses all potential errors in Judge Krantz's decisions other than the ones the Board already identified. Thus, the Respondents have no remaining arguments to pursue in further proceedings, and the correct result is to remand with an instruction to reinstate Judge Krantz's denial of benefits.

## VI.

Factfinders presented with conflicting evidence must make hard decisions about which evidence to accept and which to reject. Once they have made that decision, their findings are usually entitled to great deference. Even though agency factfinders receive less deference than juries do, higher tribunals may not overturn their findings based on contrived, hypertechnical objections. In this case, the Board did just that in vacating Judge Krantz's findings. Accordingly, the correct result in this case is to grant the CWP Fund's petition for review, vacate the Board's orders, and remand to the Board with an instruction to reinstate Judge Krantz's 2013 decision denying benefits. And that is the judgment of the court.

*PETITION GRANTED;*
*VACATED AND REMANDED WITH INSTRUCTIONS*

43

TRAXLER, Senior Circuit Judge, concurring in the judgment:

I concur in Judge Richardson's opinion insofar as it ultimately concludes that the Board erred in its 2013 order vacating and remanding Judge Krantz's 2013 decision and order denying black lung benefits to petitioner Bell. I write separately to explain how I would approach this case.

First, I agree that we have jurisdiction over the Board's 2013 interlocutory decision vacating and remanding Judge Krantz's denial of benefits. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); 33 U.S.C. § 921(c) (Upon the filing of a petition for review from the final order of the Board, "the court shall have jurisdiction of the proceeding and shall have the power to give a decree affirming, modifying, or setting aside, in whole or in part, the order of the Board.").

Although we have not specifically addressed the question of whether we have jurisdiction over interlocutory decisions of the Board under these provisions, our decision to do so here is not a novel exercise of our jurisdiction. In *Collins v. Pond Creek Mining Company,* for example, the Board affirmed the ALJ's determination that a miner's widow was not entitled to collateral estoppel on the issue of whether her deceased husband suffered from pneumoconiosis (a finding that had been made in the miner's claim), but remanded to the ALJ for further proceedings. On remand, the ALJ again denied benefits to the widow. In the widow's appeal from this second denial of benefits, the Board refused her request that it revisit its earlier collateral-estoppel ruling under the law-of-the-case doctrine. Nevertheless, we exercised jurisdiction over the Board's prior ruling under

44

§ 921(c), and held that the Board had indeed erred in failing to accord preclusive effect to the ruling in the miner's case. *See Collins v. Pond Creek Mining Co.,* 468 F.3d 213, 214-217 (4th Cir. 2006).

In this case, the Board similarly declined the CWP Fund's request that it revisit its interlocutory decisions, concluding that the CWP Fund had not demonstrated an exception to the law-of-the-case doctrine. And, as in *Collins,* we have jurisdiction to consider the Board's earlier rulings.[1]

Second, I agree that the Board erred as a matter of law in 2013 when it vacated Judge Krantz's initial decision and order denying Bell's claim for black lung benefits.[2] "In black lung cases, our review of the Board's order is limited." *Harmon Mining Co. v. Dir., Office of Workers' Comp. Programs*, 678 F.3d 305, 310 (4th Cir. 2012) (internal

---

[1] As Judge Richardson points out, neither Bell nor the Director directly challenges our jurisdiction, and both have wholly failed to address the issue of whether the Board erred in vacating and remanding ALJ Krantz's prior decisions. Bell's suggestion that the Board's invocation of the law-of-the-case doctrine somehow limits our review is patently without merit. The law-of-the-case doctrine does not impact our jurisdiction over the Board's order, or the scope of our review of the merits of the Board's interlocutory decisions.

[2] In its reply brief, the CWP Fund suggests, in a footnote, that Bell's and the Director's failure to "substantively respond to its argument that the Board erred in vacating ALJ Krantz's 2013 and 2014 denials of benefits," opens the door for us to find that the respondents "have conceded the Fund's arguments have merit." Reply Brief at 1. Although I too am puzzled by this failure to respond in any meaningful way to the crux of the CWP Fund's arguments on appeal, the CWP Fund has not argued that Bell altogether waived or forfeited review of these issues and, even if it had, I would also exercise our discretion to review the Board's orders on the merits. *See Alvarez v. Lynch,* 828 F.3d 288, 295 (4th Cir. 2016).

quotation marks omitted).  Where an ALJ's decision has been affirmed by the Board, we review the ALJ's decision "to determine whether it is in accordance with the law and supported by substantial evidence."  *E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs,* 805 F.3d 502, 510 (4th Cir. 2015).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 252 (4th Cir. 2016) (internal quotation marks omitted).

> [When] [a]pplying this standard, we do not undertake to reweigh contradictory medical evidence, make credibility determinations, or substitute our judgment for that reached below.  Rather, the duty to resolve conflicts in the evidence rests with the ALJ as factfinder.  And when conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled or has pneumoconiosis, the responsibility for that decision falls on the ALJ.

*Id.*

The Board's statutory standard of review of the ALJ's decision is essentially the same as our own.  The Board must affirm the ALJ's factual findings "if supported by substantial evidence in the record considered as a whole."  33 U.S.C. § 921(b)(3).  And where, as here, the Board "has reversed the ALJ, we must review the [Board's] decision for errors of law and to ensure the [Board's] decision adhered to its statutory standard of review."  *Westmoreland Coal Co. v. Sharpe ex rel. Sharpe*, 692 F.3d 317, 327 (4th Cir. 2012) (internal quotation marks omitted).

In its 2013 decision, the Board did not conclude that Judge Krantz's decision was not supported by substantial evidence in the record, or that Judge Krantz failed to address any relevant medical evidence.  Rather, the Board concluded that Judge Krantz's decision

46

failed to adequately explain why he chose to credit Dr. Shipley's opinion over that of Dr. Forehand. This was error by the Board.

It is true that an ALJ must "conduct an appropriate analysis of the evidence to support his conclusion." *Sea "B" Mining*, 831 F.3d at 252 (internal quotation marks omitted). This is because, "unless the ALJ has analyzed the evidence and has sufficiently explained the weight he has given to the exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (internal quotation marks and alterations omitted). The ALJ cannot credit or reject evidence "for no reason or for the wrong reason." *Id.* at 253 (internal quotation marks omitted). "Although this requirement is not intended to be a mandate for administrative verbosity, a reviewing court must be able to discern what the ALJ did and why he did it." *Id.* (internal quotation marks omitted).

In his 2013 decision denying benefits, ALJ Krantz considered the medical evidence presented and, pertinent to this inquiry, adequately explained his reason for crediting Dr. Shipley's negative x-ray interpretation over Dr. Forehand's positive x-ray interpretation. While he perhaps *could* have chosen to credit Dr. Forehand's interpretation over that of Dr. Shipley's, it was solely within his province as the factfinder to make the determination and he did not err in making it.[3] Nor, as Judge Richardson has

---

[3] This is not to say that I would agree that a contrary finding by ALJ Krantz based upon Dr. Forehand's positive x-ray interpretation would have ultimately been one supported by substantial evidence in this record. Dr. Shipley's findings were explained, (Continued)

explained, did our decision in *Westmoreland Coal Co. v. Cox*, 602 F.3d 276 (4th Cir. 2010), allow the Board to vacate and remand ALJ Krantz's decision. Nothing in *Cox* required ALJ Krantz to explicitly consider whether Dr. Shipley's reading was speculative or to expound upon his valid reason for crediting Dr. Shipley's reading over that of Dr. Forehand.

In sum, ALJ Krantz's decision to credit Dr. Shipley's opinion and to deny black lung benefits to Bell was both adequately explained and supported by substantial evidence in the record. In concluding that ALJ Krantz erred in relying on Dr. Shipley's negative reading without addressing whether the reading was speculative, the Board effectively reweighed the contradictory medical evidence and suggested that, in its judgment, the outcome should have been different. Because the Board failed to adhere to its proper statutory standard of review by requiring more than it could of the ALJ, it erred in vacating and remanding ALJ Krantz's denial of black lung benefits.

Although my analysis of this case differs from Judge Richardson's, the remedy that I would grant to the CWP Fund is effectively the same. I would grant the CWP Fund's petition for review, vacate the 2018 decision of the Board affirming ALJ Johnson's decision and order awarding benefits to Bell, and remand with instructions for the Board to deny Bell's claim for benefits as decided by ALJ Krantz in his 2013 decision.

---

albeit qualified in the sense that he recognized the lack of absolute certainty in medicine. Dr. Forehand's finding, while unequivocal, was conclusory at best.

THACKER, Circuit Judge, dissenting:

I respectfully dissent from Judge Richardson's decision to reinstate Judge Krantz's decisions denying benefits. I agree with the Board that Judge Krantz's decisions are not supported by substantial evidence, and I also agree with the Board that Judge Johnson's decision awarding benefits is supported by substantial evidence. But I write to address a more discrete issue: Judge Krantz's failure to sufficiently explain his reliance on the opinion of Dr. James Castle, despite the apparent conflict between Dr. Castle's opinion and the regulatory definition of legal pneumoconiosis.

Bell worked in an underground coal mine for over 15 years. He is now totally disabled by respiratory impairments. Accordingly, he is entitled to a rebuttable presumption that he has pneumoconiosis arising from his coal mine employment. *See* 30 U.S.C. § 921(c)(4); *see also W. Va. CWP Fund v. Dir., Office of Workers' Comp. Programs*, 880 F.3d 691, 695 (4th Cir. 2018). Relevant for the purposes of this dissent, an employer may rebut a presumption of pneumoconiosis, in part, by demonstrating that the petitioner does not have legal pneumoconiosis. *See* 20 C.F.R. § 725.305(d)(1)(i)(A); *see also W. Va. CWP Fund v. Bender*, 782 F.3d 129, 137 (4th Cir. 2015). The Black Lung Benefits Act ("BLBA") defines legal pneumoconiosis as "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a).

Relying on the opinion of Dr. Castle, Judge Krantz concluded that the CWP Fund demonstrated that Bell does not have legal pneumoconiosis. Although Dr. Castle found a "mild to moderate airway obstruction" in Bell's lungs, he found no evidence of any

49

"restriction." J.A. 24. Based on his view that coal dust-related disease does not cause a purely obstructive impairment, Dr. Castle concluded that pneumoconiosis did not cause Bell's impairment. But, as noted above, legal pneumoconiosis includes "any chronic restrictive *or* obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a) (emphasis supplied). Thus, Dr. Castle's view -- that coal dust-related disease does not cause a purely obstructive impairment -- conflicts with the regulatory definition of legal pneumoconiosis. *See Warth v. S. Ohio Coal Co.*, 60 F.3d 173, 175 (4th Cir. 1995) ("Chronic obstructive lung disease . . . is encompassed within the definition of pneumoconiosis for the purposes of entitlement to Black Lung benefits.").

We have warned Administrative Law Judges ("ALJs") to be skeptical of medical opinions premised on the view that coal mine employment does not cause purely obstructive impairments. Specifically, we have "cautioned ALJs not to rely on medical opinions that rule out coal mine employment as a causal factor based on the erroneous assumption that pneumoconiosis causes a purely restrictive form of impairment." *Stiltner v. Island Creek Coal Co.*, 86 F.3d 337, 341 (4th Cir. 1996). Indeed, we have directed that medical opinions based on the belief that chronic obstructive lung disease cannot be caused by breathing coal mine dust "must be considered bizarre in view of [] Congress'[s] explicit finding to the contrary." *Eagle v. Armco, Inc.*, 943 F.2d 509, 511 n.2 (4th Cir. 1991).

50

Nonetheless, Judge Krantz failed to sufficiently address the apparent conflict between Dr. Castle's conclusion and the regulatory definition of legal pneumoconiosis. Judge Krantz stated:

> Dr. Castle indicated that "when coal workers' pneumoconiosis causes impairment, it generally does so by causing a mixed, irreversible obstructive and restrictive ventilatory defect. There was no evidence of any restriction in this case." Chronic obstructive lung disease is included within the definition of pneumoconiosis for purposes of the [BLBA]. However, a physician's opinion should not be discredited merely because he states that the miner "likely" would have exhibited a restrictive impairment in addition to chronic obstructive disease if he had coal workers' pneumoconiosis. Therefore, I do not discredit Dr. Castle's opinion merely because he suggested that he generally expects to see both obstructive and restrictive defects.

J.A. 168–69 (internal citations omitted).

The APA requires that an ALJ's opinion contain "findings and conclusions, and the reasons or bases therefor, on all material issues of fact, law or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A). Reviewing courts must be able to discern "what the ALJ did and why he did it." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016) (quoting *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999)); *see also Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 533 (4th Cir. 1998) (noting that an ALJ must "adequately explain why he credited certain evidence and discredited other evidence."). Such exposition is particularly important when an ALJ is confronted with conflicting evidence. *See Consolidation Coal Co. v. Filer*, 81 F.3d 149 (4th Cir. 1996) ("Indeed, unless the ALJ's opinion confronts the conflicts, weighs the opinions and the evidence and articulates why one line of authority is persuasive and the other is not,

51

judicial review under a substantial evidence standard is not possible."). Although Judge Krantz noted the existence of the conflict between Dr. Castle's conclusion and the regulatory definition of legal pneumoconiosis -- and stated that he did not discredit Dr. Castle's opinion because of it -- he did not explain why he chose to credit Dr. Castle's opinion despite the conflict.

I believe Judge Krantz made two other errors of note. First, Judge Krantz relied on the opinion of Dr. Shipley despite Dr. Shipley's refusal to follow radiographic standards imposed by the Department of Labor (the "DOL"). Dr. Shipley noted the presence of "[i]ll-defined lobulated noncalcified nodular lesions" present in Mr. Bell's lungs. J.A. 15. However, without answering the inquiries on the DOL-required form regarding the existence or absence of large opacities -- including whether Bell's lesions had a diameter of more than one centimeter -- Dr. Shipley concluded that Bell's x-ray did not show large opacities. *Id.* at 16; *see also* 20 C.F.R. § 718.304(a) (defining large opacities as "greater than one centimeter in diameter"). In his narrative report, Dr. Shipley simply said that those nodular lesions "are unlikely to represent large opacities of pneumoconiosis." *Id.* at 15. He also equivocally stated that the lesions were "probably not CWP [that is, coal workers pneumoconiosis]." *Id.* at 16. This is inconsistent with controlling radiographic standards regarding the diameter of opacities, a critical factor for determining whether complicated pneumoconiosis is present. *See E. Associated Coal Corp. v. Dir., OWCP*, 220 F.3d 250, 255-56 (4th Cir. 2000). Second, Judge Krantz ignored relevant evidence. Judge Krantz refused to rely on Bell's medical treatment records, including a 2011 CT scan revealing an "opacity in the right upper lobe [that

52

remained] stable at about 4.7x1.6 cm when compared to the prior studies." J.A. 26. The 2011 CT scan, however, constituted relevant evidence as to the existence of a large opacity in Mr. Bell's lungs. Despite the fact that this evidence was before Judge Krantz, he wholly ignored it. That alone is reversible error. *See Island Creek Coal Co. v. Compton*, 211 F.3d 203, 208-09 (4th Cir. 2000) (requiring ALJs to consider all relevant evidence in reaching their determinations).

Judge Richardson's opinion acknowledges that this court has "long held that purely obstructive impairments can fall within the legal definition of pneumoconiosis." *Ante* at 35. And Judge Richardson's opinion concedes that "[t]here is a fair argument that expert opinions like Dr. Castle's -- those stating that purely obstructive lung disease is not 'likely' or 'generally' caused by coal-dust exposure -- should be given less weight because they are in tension with the legal definition of pneumoconiosis." *Id.* at 37. Indeed, Judge Richardson's opinion recognizes, "[A]n expert opinion *cannot* be credited when it rests on the assumption that purely obstructive lung disease can *never* be legal pneumoconiosis." *Id.* at 36 (first emphasis supplied). But Judge Richardson's opinion qualifies this court's tradition of skepticism toward opinions that exclude purely obstructive impairments from the definition of legal pneumoconiosis by distinguishing opinions that are "in tension with" that tradition from those that are "contrary to" it. *Id.* Judge Richardson's opinion then points to a single sentence from Judge Krantz's decision -- noting that Judge Krantz declined to "discredit Dr. Castle's opinion merely because he suggested that he generally expects to see both obstructive and restrictive defects" -- to suggest that Judge Krantz sufficiently addressed the issue. *Id.* at 38 (quoting J.A. 169).

In my view, the semantic differences between "in tension with" and "contrary to" are irrelevant. Even assuming Dr. Castle's opinion is merely "in tension with" the regulatory definition of legal pneumoconiosis, Judge Krantz's decision to heavily credit Dr. Castle's opinion without grappling with that tension is inexcusable. A rule that requires ALJs to *wholly discredit* opinions that directly contradict a regulatory definition surely does not allow an ALJ to heavily credit -- without explanation -- an opinion that contradicts that same regulatory definition in a slightly less direct way. Because I find Judge Richardson's opinion minimizes the conflict between Dr. Castle's opinion and the regulatory definition of legal pneumoconiosis and overstates Judge Krantz's attention to it, I dissent. I would affirm the Board in vacating Judge Krantz's decisions.